Justice Wise Power, J.
This is a proceeding brought under article 6 of the Family Court Act by the Jewish Child Care Association, an authorized agency, to permanently terminate custody of the mother and award custody of her child to the petitioner.
The history of article 6 is rooted in the concern for children who have been placed in authorized agencies voluntarily or by court order. Studies have shown that the longer a child is left in care the less likely is his return to his natural family. Self-examination by agencies of children in care has shown a substantial number who after placement are rarely visited and become lost children for whom no plans are made by their families. Occasional visits, a Christmas gift, or a birthday card, or nothing, become the tenuous contact between these children and their natural families. Institutionalized at public expense year after year, they grow up with a sense of not belonging to anyone or with unrealistic fantasies about homes that will never be.
The purpose of article 6 and the preceding statute was twofold. First, it sought to place an obligation on authorized agencies having custody of children to work with parents toward strengthening their ability and sense of responsibility for re-establishing homes for children in placement. Second, when such efforts failed for a period of over a year the statute gives authority to the authorized agency to petition for the *701 termination of parental rights, thus freeing a child for adoptive placement when it is in the best interest of the child. In keeping with these two purposes, the law requires that certain facts be alleged including the efforts of the agency to work with the parents and the response of the parents. Such requirements provide safeguards to parents, since they obligate the authorized agencies having temporary custody of children to exert effort to re-establish the natural home prior to filing a petition for termination of parental rights.
The petition in the instant case prays that the infant, born on May 22,1964 and committed to its care one week later, shall be adjudicated a permanently neglected child, that the mother shall be deprived permanently of said child’s custody, and that custody shall be awarded to the agency. The petition alleges facts in accordance with the statutory requirements for such a proceeding under section 614 of the Family Court Act:
“ (a) the child is a person under eighteen years of age;
“ (b) the child has been placed in the care of an authorized agency, either in an institution or in a foster home;
“(c) the authorized agency has made diligent efforts to encourage and strengthen the parental relationship and specifying the efforts made;
“(d) the parent or custodian, notwithstanding the agency’s efforts, has failed for a period of more than one year following the placement or commitment of such child in the care of an authorized agency substantially and continuously or repeatedly to maintain contact with and plan for the future of the child although physically and financially able to do so; and
“(e) the moral and temporal interests of the child require that the parents’ or other custodian’s custody of the child be terminated permanently.”
At the fact-finding hearing, counsel for the petitioner, counsel for the Department of Social Services, and counsel for the mother stipulated that the child had been in placement on a voluntary commitment since she was seven days old, that the mother had provided no home and no support during the period of over four years, but that the mother had visited the child from time to time.
Counsel for the petitioner called as its first witness a supervisor of the authorized agency in whose care the child has been and offered the record kept in the regular course of business. Counsel for the mother contended that, since the supervisor was a certified social worker, all communications between her and the mother and/or professional observations relating to the mother, and all communications with or observations by *702 the supervisor’s subordinates, were privileged communications and, therefore, might not be disclosed without authorization of the mother under CPLB 4508.
This court, like counsel for both parties, has examined the contention of counsel for the mother in the light of the fundamental conditions set forth as necessary to the establishment of a privilege against disclosure between persons standing in given relationships as stated in Wigmore, Evidence (vol. 8 [3d ed.], p. 531, •§ 2285):
1. Communications must originate in the confidence that they will not be disclosed;
2. The element of confidentiality must be essential to the maintenance of the relationship between the parties;
3. The relation is one which in the opinion of the community ought to be fostered;
4. The injury that would inure to the relationship as a result of disclosure must be greater than the benefit gained in regard to the correct disposal of litigation. The burden of establishing the conditions is on the party alleging the privilege. There is no evidence before this court that the communications between the mother and the certified social worker originated in the confidence that they would not be disclosed. Indeed, there is reason to hold that the primary responsibility and relationship of the authorized agency ran to the child committed to its care by the Department of Social Services and not to the child’s mother. There is even reason to question whether this mother can be regarded as a [11] client ’ ’ of the agency. In regard to the second condition there is no evidence as to the essentiality of confidentiality between the social worker and the mother, and no evidence has been submitted as to the character or the extent of the relationship between the social worker and the mother.
In regard to the third condition, where a child has been entrusted to an authorized agency for care, good social-work practice today requires that the agency seek to strengthen the family ties and prepare the family for the return of the child where possible. That the agency must allege such efforts under section 614 and establish them by a fair preponderance of the evidence under section 622 reflects the importance attached to such efforts by the Legislature. However, neither the requirements of good practice nor the objectives sought provide a basis for holding that an authorized agency shall place the relationship with a parent in a category which would require *703 absolute confidentiality to the detriment of the child entrusted to its care.[1]
In regard to the fourth condition required to establish confidentiality, this court is satisfied that the disclosure of evidence relevant to a correct determination of whether the mother of an infant should be permanently deprived of its custody must be regarded as of far greater importance than any injury that might inure to the relationship between the social worker and the mother.[2]
The motion to exclude must be denied, since to grant it would require the suppression of evidence material to a proper judicial determination of the future life of a child with the possible result that the merits of the claims of the mother and the basic question in issue as to the best interests of the child might never be reached.[3]
The motion to exclude must be denied on the further ground that to allow it would mean that the enactment of CPLB 4508 constituted a repeal of article 6 of the Family Court Act.[4] There is nothing to warrant an interpretation of CPLB 4508 so as to comprehend such a change in the substantive law in regard to permanently neglected children under article 6 which was designed for their protection and that of their parents. It is inconceivable that the Legislature intended to prevent or hinder compliance with article 6 through the enactment of *704 CPLB 4508. Even if the communications between the mother and the social worker met the classic requirement of confidentiality, the procedural safeguards under CPLÍt 4508 would have to yield where the prevention of disclosure interfered with the substantive law as set forth in article 6, until such provisions are repealed or amended by the Legislature. The rights of the mother under the CPLB. like other individual rights are not unlimited and are indeed in this case limited by the rights of her child as set forth under article 6 of the Family Court Act.
The question raised in this case by the motion to suppress the record of the authorized agency kept in the regular course of business and the testimony of the social worker under CPLB 4508 may well be one of first impression in this.State. However, the extension of privilege against disclosure of communications made to social workers has been the subject of substantial study, of legislative action, and of judicial interpretation in various jurisdictions.
While the attorney-client privilege is the only one rooted in common law and 'continued by statute in all States, the physician-patient privilege against unauthorized disclosures has been enacted by statute in approximately two thirds of the States, and the clergy-parishioner ‘ ‘ confession ’ ’ has been protected by statute in a somewhat lesser number of States.[5] Confidential communications between persons standing in other given relations have been declared privileged by statutes in various States. At times exceptions to the privilege have been enumrated in general or specific terms. Thus in North Carolina, “ the presiding judge of a superior court may compel such [privileged] disclosure, if in his opinion the same is necessary to a proper administration of justice.”[6]
In 1968 the 'Massachusetts Legislature extended the privilege to bar disclosure of any communication, wherever made, between a patient and a psychotherapist relative to diagnoses or treatment of the patient’s mental or emotional condition. However, the Legislature also spelled out six areas in which such privilege would not apply. These included three types of proceedings in which the Judge or presiding officer finds that ‘ ‘ it is more important to the interests of justice that the communication be disclosed than that the relationship between patient and psychotherapist be protected.” [7]
*705 The New York statute, enacted in 1965, extending the doctrine of privileged communications to persons standing in the relation of a client to a certified social worker,[8] may be regarded as directed to stem the unauthorized disclosures of communications to social workers by persons seeking help or as an effort by one more professional group to achieve the status granted by statute to lawyers, physicians and clergymen in this State. Regardless of the motivation that lay behind the support for the legislation, it reflects the growing antipathy to the assumption that the need for help negates the right to privacy or endows- those authorized to give -help with the right to disclose confidences without authorization by persons seeking help.
The first significant attempt to protect the privacy of persons needing welfare assistance is to be found in the Social Security Act of 1935. That Federal law required that State plans for old-age assistance, aid to dependent children, and aid to the blind, should include safeguards to protect the privacy of recipients as a condition to receiving Federal funds.[9]
Relevant to the issue before this court is the interpretation of the provision in the Federal Security Act which restricted the use or disclosure of information concerning thé recipient of public assistance under the State plan for aid to dependent children to purposes directly connected with the administration of such aid. The issue arose when a Juvenile Court at the dispositional stage issued a subpoena duces tecum directing the Administrator of the County Welfare Department to produce all records pertaining to a child before the court. The County Administrator refused and submitted a summary of the record. This was rejected by the Juvenile Court as inadequate in a memorandum opinion setting forth the reasons for judging the summary as inadequate and pointing out that the practice of the Juvenile Court was to hold hearings in private and to withhold from public inspection the records obtained. The Juvenile Court directed that the records be produced under penalty of being held in contempt. The Administrator thereupon filed a writ of certiorari to review the order of the Juvenile Court.
The order of the Juvenile Court was affirmed.[10] The Supreme Court of Washington expressed the belief that neither the *706 act nor the rules contemplated or comprehended situations involving the administration of Juvenile Court matters and that the secrecy of the records would be as sedulously preserved by the Juvenile Court as by the Welfare Department. The court stated (p. 167): “It is an inherent power of a court of justice, within the sphere of its jurisdiction to compel witnesses to appear before it and testify concerning any relevant facts within their knowledge, in a case then pending in that court.”'
Then, addressing itself to the relator’s contention that the information sought involved privileged communications exempt from disclosure, the court referred to the four fundamental conditions necessary to the establishment of a privilege against disclosure between persons standing in given relations as stated in Wigmore, Evidence (vol. 8, 3d ed., p. 527, § 2285). The result reached by the Supreme Court of Washington seemed clearly based on the judgment that the fourth requirement on which confidentiality must be based, namely that ‘ ‘ the injury that would inure to the relation by disclosure of the communication must be greater than the benefit gained for the correct disposal of the litigation ” (p. 168) was not present. Indeed, the court found the opposite prevailed since it held that the ultimate disposition of a maladjusted child by the Juvenile Court must require the use of all the data available.
This court now turns to the merits of the issues raised by the petition. The record of the authorized agency, the testimony of the social worker, and the testimony of the mother provide the basis on which this court must determine whether the allegations required by subdivisions (a), (b), (e), and (d) of section 614 of the Family Court Act are supported by a fair preponderance of the evidence. (§ 622.)
There is no question that the allegations required by subdivisions (a) and (b) have been established. Indeed it has been stipulated that the child is under 18 years of age and has been in placement in the care of the petitioner, an authorized agency, since she was one week old.
In regard to the requirement set forth in (c), that the ‘ ‘ agency has made diligent efforts to encourage and strengthen the parental relationship ’ ’ the evidence must be carefully examined. There is no doubt that the authorized agency, in addition to providing excellent care for the child, has arranged for frequent casework conferences with the mother and has provided for visitation by the mother with the child. The record, accepted in evidence, details both the casework conferences with the mother and the visits between mother and child.
*707 The record reveals that within less than five months after admission of the child, the agency sought and placed the child in a foster home where the child could “ perhaps be absorbed into the family and be adopted. ’ ’ At that time the agency noted that the mother was emotionally disturbed and inadequate, but was unready to surrender the child. The agency had an older half-sibling placed in its custody, whom the mother had visited only sporadically during the preceding five years and who was still in placement.
From this point on, the record is replete with reports on the excellent progress of the child in the foster family, the devotion of the foster family to the child, and their anxiety lest the child be removed. The record and the testimony of the social worker describe the erratic behavior of the mother during some visits, her bizarre appearance on some occasions, her inability to establish a real relationship with the child. The negative reaction of the child to the mother’s visits, including recoiling when the mother’s behavior was bizarre, the sleeping difficulties following the visits, and the rejection of the mother by the child, are vividly presented.
In view or the mother’s history, her neglect of the older half-sibling now in placement for nine years, and the disturbing character of many of the mother’s visits, the agency workers understandably concluded that the best interest of the child would be served if she could be placed for adoption in a stable, loving family. However, that conclusion led the caseworkers to focus their efforts on helping the mother to surrender the child for the sake of the child and herself. The caseworkers could not in good conscience and did not in fact make any significant effort to strengthen the parental relationship as required by sections 614 and 622 of the Family Court Act.
The statute as enacted imposes this burden and it can only be removed or modified by legislative action. The record in this case provides a classic example of the restrictive nature of the statute under which this court can terminate parental rights. The mother has been' hospitalized many times for depressive episodes which have included suicidal attempts. The diagnoses by various hospitals have included “ hysterical personality with some depressive features ”, “ pychoneurosis mixed type, prognosis guarded,” “ catatonic schizophrenia with depressive features ”, “ emotionally unstable personality with masked depressive tendencies,” and “ psychoneurosis, anxiety reaction with underlying schizoid personality. Prognosis guarded.” The record, the testimony of the social worker, and observation by this court substantiate the emotional dis *708 turbance and limitations of this mother as a mother now or in the foreseeable future.
Visits with the mother were soon seen as disturbing to the child and were therefore not encouraged or were allowed only under supervision. There is no basis for criticizing the action of the agency whose first responsibility was the well-being of the child. The agency could not have sought to strengthen the parental relationship without violating its responsibility for the welfare of the child in its custody. Yet, that is what the present statute requires as a condition to terminating parental rights.
Although this court is satisfied it would be in the best interest of the child to terminate parental rights, it cannot find that the statute empowers it to do so. The mother has continued to visit this child,[11] has persistently rejected the idea of surrender, and the mother continues to speak of making a home for both her children in the future when she feels stronger. While this court finds no evidence to sustain this expressed hope and is satisfied that the mother is not competent to care for this child, the evidence does not warrant a finding that the present statutory requirement has been met. This court must therefore reluctantly dismiss the petition.
It is to be hoped that the Legislature will, through its joint commission, study the problem posed by this and many similar cases. It would seem that sound social policy should authorize the termination of parental rights where it is established by a proponderance of the evidence, including medical testimony, that a parent or parents are not and will not be able to be parents in a true sense or provide a home for their children. Without corrective legislation hundreds, if not thousands of children, will continue their lives as agency boarders without meaningful family ties.

. Even in the interpretation of the attorney-client privilege, it has been held that where an attorney acts for two parties having a common interest, communications by the panties to the attorney are not privileged in a controversy between the same parties. (Liberty Mut. Ins. Co. v. Engels, 41 Misc 2d 49 [1963]. See Wigmore, Evidence vol. 8 [3d ed.], p. 603, § 2312.)

. See People ex rel. Chitty v. Fitzgerald (40 Misc 2d 966, 967 [1963]). In habeas corpus action for visitation by a father the court stated: “ in the exercise of the court’s inherent power to do what is best to protect the welfare of the infant, the right of the petitioner to invoke the patient-physician privilege must yield to the paramount rights of the infant.”

. (See Milano v. State of New York, 44 Misc 2d 290. See, also, Matter of Do Vidio, 56 Misc 2d 79. Matter of Bachmcm v. Mejias, 1 N Y 2d 575.)

. It is noteworthy that the sections in the CPLR concerning the privilege of confidential communications direct that an attorney “ shall not disclose, or be allowed to disclose such communication” (§ 4503), that a physician, dentist and nurse “shall not be allowed to disclose” (§ 4504), that a clergyman “shall not be allowed to disclose” (i§ 4505). However, § 4508 covering social workers provides that a social worker, certified under the Education Law, “ shall not be required [with four exceptions] to disclose a communication.” Apart from the question of whether this section of the CPLR is relevant in the instant ease there is question 'as to whether it can be invoked by the respondent to impose silence where the social worker is seeking to submit evidence in accordance with procedures required by article 6 of the Family Court Act.

. Joseph T. Alves, Confidentiality in Social Work, the Catholic University of America Press, Wash. D. C. 1959, pp. 57-61, 61-69.

. No Car. Gen. Stat. of 1943, § 8-53.

. Gen. Laws of 1968, ch. 233, § 20B, subd. (e).

. CPLR 4508.

. Alves, supra, Note, 11. p. 79. See, also, p. 81 — citing Bell v. Bankers Life & Cas. Co. (327 111. App. 321, [1945]). Count held that the protection was directed against voluntary disclosure and did not preclude the submission of records subpoenaed to establish age of a person in a suit by an insurance company against a person insured when contents were pertinent to a legal inquiry.

. (State ex rel. Saugland v. Smythe, 25 Wn. [2d] 161 [1946].)

. The mother visited twice in 1964, three times in 1965, six times in 1966, four times in 1967, and nine times in 1968.