Justine Wise Polier, J.
This proceeding was brought under article 6 of the Family Court Act by the Jewish Child Care Association, an authorized agency, in order to have the child found permanently neglected and to secure an order permanently awarding custody to the petitioner. The main thrust of the proceeding by the petitioner is to secure permanent custody so that the agency will be enabled to place the infant for adoption with the foster family that has provided care for the child since she was an infant.
At the initial trial this court found that, within less than five months after admission to the Jewish Child Care Association, the agency sought and placed the child in a foster home where the child could, according to the agency record, 1 ‘ perhaps be absorbed into the family and be adopted.” This court found such action understandable in view of the mother’s physical and emotional problems, her past hospitalization, and the continuing foster care of an older half-sibling within the same agency.
Section 614 of article 6 requires that a petition to terminate parental custody must allege that (a) the child is under 18 years of age and (b) that the child has been placed in the care of an authorized agency. These two requirements were met by stipulation of counsel. The third subdivision (c) of this section requires that the petition allege that ‘‘ the authorized agency has made diligent efforts to encourage and strengthen the parental relationship and specifying the efforts made ”. The fourth subdivision (d) of this section requires that the petition allege that the parent, notwithstanding the agency’s efforts, has failed for a period of more than one year following the placement or commitment “ substantially and continuously or repeatedly to *325 maintain contact with and plan for the future of the child although physically and financially able to do so ”.
Under section 622 this court is required to determine at the adjudicatory hearing whether the allegations in these four subdivisions set forth in section 614 are supported by a fair preponderance of the evidence. Following the initial trial, this court found that the agency ‘ ‘ could not in good conscience and did not in fact make any significant effort to strengthen the parental relationship ” as required by sections 614 and 622 of the Family Court Act, and stated that the restrictions placed on this court by the legislation required a legislative remedy. The petition was therefore dismissed; (Matter of Sylvia Clear, 58 Misc 2d 699, 707.)
Having found that the agency had not met the requirement of subdivision (c) of section 614 and section 622 to show by a preponderance of the evidence that it made diligent efforts to encourage and strengthen the parental relationship, this court did not make findings in regard to subdivision (d) of section 614 at the fact-finding hearing.
On appeal, the decision of this court was reversed and the matter was remanded for further proceedings consistent with the memorandum of two Justices in which a third Justice concurred (two Justices dissented) (Matter of Klug, 32 A D 2d 915). The appellate court held that, under the unusual circumstances, the proof that petitioner made efforts 11 to help the mother surrender the child for the sake of the child and the mother ” did not dictate a finding that the agency failed to meet the obligations imposed by the statute. Narrow construction of the statute was disapproved.
The appellate court directed that:
“ (1). (F)urther proof of this critical issue (as to whether the agency had met the obligation to strengthen the parental relationship) should be adduced (at the hearing.)
“ (2). The court should also permit the petitioner to submit proof in support of its allegation * * * that the parent has failed for a period of more than one year substantially and continuously to maintain contact with and plan for the future of the child although physically and financially able to do so. (Italics are in the App. Div. decision.)
“ (3). (t)he mother’s present financial and physical ability to care for her child should be inquired into, as well as her ability or lack of ability to substantially plan for the future of the child.” (Italics supplied by this Family Court.)
The appellate court decision placed emphasis on a determination as to whether the requirements of article 6 had been com *326 plied with “ under the particular facts and the totality of circumstances ” in the case.
In accordance with the decision of the Appellate Division, this case was restored to the calendar and further testimony was taken by this court on the request of counsel for both sides.
The testimony of the supervisor and the written record kept by the agency in the regular course of its work are the chief sources of evidence, since there has been a frequent change of caseworkers assigned and only the last one was still on staff and produced to testify.
The record establishes that the infant was committed to the agency at five days of age in May, 1964, and placed in the present foster home when a few months of age. At the time of the commitment the mother was ill and she experienced repeated hospitalization. Because of her disturbed behavior, and her past failure to provide a home for an older half-sibling of this infant, the agency believed surrender by the mother would he in the best interest of the child. Supervised visits in the agency offices were allowed on request, hut the mother did not pursue them with regularity. In fact, her requests only became more frequent in the fall of 1967. She was allowed far greater privileges with the older child, including visits in the foster home and taking the child out without supervision. Her resentment against the agency increased when she was repeatedly refused unsupervised visits with the child. It is understandable that the permission of such visits only in the presence of the foster mother (regarded as a rival for the child’s affection) or the caseworker, or both, seemed to her to be humiliating and unsatisfactory. She made no visits from October, 1967 to January, 1968. Infrequent visiting occurred again from May, 1968 until October, 1968. Then in January, 1969, all visiting stopped on advice of counsel of the agency since the case was pending on appeal.
After the September, 1969 hearing, this court directed that the mother should he allowed to visit with the child without supervision. This was attempted, hut according to the agency witnesses the child became ill, had nightmares and refused to eat after several such visits. The agency refused further unsupervised visits and the mother refused supervised visits.
This court must take judicial notice of the fact that although voluntary agencies undertake comprehensive agreements to work with the families of children in their care, supported by the Department of Social Services, few have developed substantial services to strengthen the natural families. In the instant case, in addition, the agency had decided that the best interests of the child would be served by a surrender for adoption. Despite this *327 fact the record states that the mother was advised that if she made substantial and realistic plans to take her daughter back into her home, more frequent visitation, including home visits would be allowed.
Relieved by the Appellate Division of a strict construction of subdivision (c) of section 614 and section 622, this court does find that, on the preponderance of the evidence, the agency did make efforts to encourage a relationship with the child, limited as it was by a conviction that such efforts would not succeed. In turn, the mother failed to show a sustained response to the efforts that were made or make realistic plans for the child.
In accordance with the direction of the Appellate Division, this court invited additional proof in support of the agency allegation that the parent failed for a period of more than one year substantially and continuously to maintain contact with and plan for the future of the child although physically and financially able to do so as required by subdivision (d) of section 614 and section 622. With consent of counsel, the court directed a complete physical examination of the mother at Beth Israel and a psychiatric study of the mother at the court clinic.
In regard to the mother’s financial circumstances, the record establishes she received welfare until she married her present husband on May 3, 1968. According To the mother, he earns $8,000 annually and has always wished her to take her children home. There is no question, therefore, of financial ability to provide. The fact that she was the recipient of public assistance prior to her marriage does not warrant a finding that she was financially unable to plan for her child prior to her marriage.
In regard to the mother’s physical condition, the record establishes that although she has a history of hypoglycemia, the blood tests are within the normal limits and she is not physically unable to care for the child. There is no evidence that she has been so unable during the past two years.
There is nothing in the record to warrant a finding that the mother’s failure to plan can be attributed since May, 1968 to either physical or financial disabilities. Yet, despite expressed hopes and even recent statements that she can now care for the children, she has failed to appear at some hearings, has failed to move to appropriate quarters, and has failed to follow through on promised plans to make a home for this child. The record also shows that, in the face of some discouragement from the agency, this mother has failed to maintain substantial and continuous contacts for recurring periods. Even in court, the mother, while stating at one point that she would like to take *328 the child ‘ ‘ right-now ’ ’, wavered and also spoke of her desire for more visitation.
The motion to dismiss the petition is denied. Under the interpretation of sections 614 and 622 by the Appellate Division, finding is made that the allegations required by subdivisions (a), (b), (c) and (d) of section 614 are supported by a fair preponderance of the evidence.
Such finding having been made, this court is now required to consider the allegations of subdivision (e) of section 614 and determine what disposition is to be made as required by the statute under sections 614 (subd. [e]), 623 to 626 and 631. Subdivision (e) of section 614 requires that in a proceeding to terminate parental rights the petition shall allege that 1‘ the moral and temporal interests of the child require that the parents’ * * * custody of the child be terminated permanently ”, and the statute directs that after an adjudicatory hearing, the court shall at a dispositional hearing determine whether the interests of the child require the permanent termination of parental rights, and, if so, what disposition shall be made (§ 623). Recognizing the serious consequences of such termination, the statute provides that, after findings have been made at the conclusion of an adjudicatory hearing, ‘1 the court may adjourn the proceedings to enable it to make inquiry into the surroundings, conditions, and capacities of the persons involved in the proceedings.” (§ 626.)
In the instant case although an authorized agency has filed the petition as required by the statute, the thrust of the action is to secure a dispositional order terminating parental rights so that the child may be placed for adoption in the present foster home. It might be argued that if an order terminating parental rights is granted, and after the child is placed for adoption, this court or the Surrogate’s Court will have the opportunity to investigate and determine whether legal adoption shall be granted.
However, the statute is clear in that it provides for three different types of dispositional orders following an adjudicatory hearing: dismissal, suspended judgment, and permanent termination of custody (§ 631). Moreover, this court is aware that, if parental rights have been permanently terminated by an order of this court, the court before which the adoption procedure is brought will no longer have a choice between the natural and the foster parents. The choice will then be limited to a choice between the foster parents and strangers to the child.
In order to exercise its responsibility as to what disposition is in the best interest of the child, this court on its own motion *329 directed a full investigation by probation of both the current homes, surroundings, and environment of the mother and the foster parents. It further directed that probation arrange for a physical and psychiatric examination of the foster mother at the court clinic, and submit such reports to the court on the adjourned date (§ 626).
The probation investigation and clinic studies were shared with counsel for both sides, who agreed to the court’s consideration of them and rested on the record. The natural mother was seen by the clinic as a person with better than average intelligence but “ with a personality disorder, utilizing inadequate judgment and reasoning in her adjustment efforts, lacking the emotional capacity for the children’s dependency needs and has shown very little expression of parental rights.” In contrast, the foster mother was described as a person of normal intelligence ‘ ‘ quite capable of providing the adequate normal guidance and supervision both materially and emotionally that the child would need.”
The hesitancy this court would ordinarily have concerning a disposition that would separate the child permanently from a half-sibling is overcome by the record which establishes that the 11-year-old half-sibling has never been told by either the agency or the mother of the existence of this child. There has been no relationship or contact of any kind.
In view of the interpretation by the Appellate Division of the controlling statute and the findings based on all the circumstances of this case, this court is satisfied that neither dismissal nor suspended judgment will serve the moral or temporal interests of the child. Either disposition would only leave the child indefinitely without a permanent home or at best, with the less than secure status of a foster-home child. In the best interest of this child, permanent termination of parental rights is ordered so that the agency will be free to move forward toward adoptive placement in the only home this child has ever known.