Justine Wise Polier, J.
An increasing number of guardianship petitions and actions to terminate parental rights so as to freenhildren in foster care for adoption are being brought to the Family Court. When contested, they present a clash between the assertion of parental rights as traditionally maintained and the assertion of the rights of children in terms of what is set forth as in their best interest. In the contested actions the parents have failed or are alleged to have failed to function as parents, but have not renounced what they regard as their parental right to have their child returned to their custody in the future when, or if, they request such return.
Frequently parents have shown little or no active interest in a child for long periods of time, or, indeed, until they receive notice of the action to terminate parental rights and free the child for adoptive placement. The parent may never have provided a home, may have maintained no real contact with the child, and may have no plans for making a home for the child. Still, the possible termination of parental rights comes as a jolt and is seen as punishment, forfeiture of what is theirs, and as a threat to self-esteem which must be fought.
A set of English decisions was recently cited to illustrate the current tensions in law in England as well as in the United States concerning the rights of children in relation to the rights of competing adult claimants.[1] In an adoption proceeding initiated by foster parents who had had a child since birth and for whom the mother had requested adoption, the mother sought to withdraw consent when the child was one year old. The English act allows dispensing with consent only if the court is satisfied that the parent (a) abandoned, neglected or ill-treated the infant, or (b) is withholding consent unreasonably.
The Judge in the court of first instance dispensed with consent to adoption holding that it was unreasonable for the biological mother to fail to take into account the child’s welfare, since removal from the only home the child had known would dis *967 turb the child emotionally and might cause a psychological disturbance. This decision was described by Professor Goldstein as changing the spirit of the statute and reversing the paramount consideration that had traditionally been accorded to the biological parent and had failed to take into account the child’s welfare.
The decision and order of adoption was unanimously reversed by the Lords of Justice of the Court of Appeals in 1970, but was subsequently reinstated by the House of Lords in April 1971. [Re W. (an infant) [1970] 3 ALL E.R. 990 6 [1971] 2 ALL ER 49.]
In recent years the Legislature in New York, as in other States, has begun to look more closely at the consequences for children of public policies and laws which fail to safeguard the welfare of children. Laws to protect children against neglect and abuse have been strengthened. The Social Services Law was amended 1969 so as to authorize the institution of adoptive proceedings on the basis of abandonment for six months instead of a year.[2]
The first permanent neglect statute (Family Ct. Act, art. 6) in New York was enacted in 1959 in order to make possible the termination of parental rights and the adoption of children, when parents, though physically and financially able, did not maintain meaningful contacts with children in foster care and plan for their return home. (Family Ct. Act, § 614, subd. [d], § 622.) It was only in 1971 that the statute was amended to relieve an authorized agency from pleading and proving efforts to strengthen the parental relationship when it pleaded and proved *968 that such efforts ‘ ‘ would be detrimental to the moral and temporal welfare of the child.”[3]
Growing concern for the hurts suffered by children who are placed ajid who are left in foster care year after year with diminishing hope of ever returning to their natural parents or being adopted has been expressed in the literature and studies throughout the field of child care.
A recent study by the Bureau of Child Welfare of all New York City children in foster care who had had no contact with either parent during the preceding six months revealed the extent to which children are still left in a state of uncertainty by being legally chained to parents who give little hope of ever acting as parents. Unfreed from such chains they remain in foster home care without any claim to permanent status year after year. Although parental contact was defined liberally to include telephone calls, letters, cards and gifts as. well ¿as visits to a child, nearly one third or 6,487 children had had no contact in over six months. Of this group nearly 60% had been in placement for more than four years. The study noted that few were legally freed for adoption even though many probably had no realistic possibilities for returning home and a large number had been in placement for a long period of time, some for their entire lives. Concern was expressed that most of the children in the study would grow up in foster homes, and would neither be returned to their parents nor adopted.[4]
In the hope of preventing such children from becoming “ lost ” children, legislation authorizing periodic review by the Family Court of all children in foster care for a continuous period of 24 months wag. enacted in 1971.[5] In 1972 the filing of petitions for such review was made mandatory in regard to the authorized agency charged with the care, custody or guardianship of a child. In addition, the legislation authorized filing of petitions for review by another authorized agency having supervision of such foster care or by the foster parents or
*969 parents in whose home the child resides or has resided during the 24 months. The Family Court is required on the proof adduced to enter an order of disposition in accordance with “ the best interest of the child ’ ’. Such order may direct continuance of foster care, the return of the child, the initiation of a proceeding to legally free such child for adoption, or that the child be placed for adoption in the foster family where he resides or with other person or persons. Such cases must now be reviewed at least every 24 months where children continue in foster care.[6]
The Legislature has thus expressed its intent to assure to children judicial review so that they will not be left without homes and will, where possible, be given the opportunity to grow up in homes where they will receive good care together with the sense of belonging and being loved that is essential to healthy development.
Each step taken toward this end by the Legislature and the courts creates rights of children which in turn deprive parents of traditional immunities from custodial consequences for failure to fulfill their duties as parents. Increasingly the correlative rights of children and the duties of parents are thus becoming articulated. The task of implementation still lies' ahead.
While the legislation can provide guidelines for adjudicating the question of permanent neglect and can provide safeguards to assure due process, there can be no single or final definition that will encompass the myriad variations in the social histories, parental attitudes or actions, the conditions of the parents and the life prospects for the child. Adjudication on a case by case basis is essential if the conflicting claims of parents and children are to be justly evaluated and determined. The instant case is representative of many in which such conflicting claims are presented to the court. It requires a re-examination of the rights of the parents and of their three children in the light of recent legislation and judicial decisions in this State.
*970 The Edwin Gould Services, an authorized child caring agency, seeks to have three children declared permanently neglected and the rights of their parents permanently terminated so that the children may be freed for legal adoption by the foster parents, who have been caring for them. The respondents, the biological parents, of the three children, oppose the petition and contend that theii parental rights should not be permanently terminated.
It is agreed that the three children are under 18 years of age and that they are in placement with the petitioner, an authorized agency in conformity with the statutory requirements for initiating a proceeding to permanently terminate parental rights.[7] There is no contention that the respondent parents are not physically or financially able to care for their children. Two contested issues are before this court in this action :
1. Did the authorized agency make the ‘1 diligent efforts to encourage and strengthen the parental relationship ” as required by the Family Court Act prior to the amendment of June 25, 1971,[8] and, if not, can it avail itself of the relief as authorized by that amendment?[9]
2. Did the parents, notwithstanding the diligent efforts of the agency, fail ‘ ‘ for a period of more than one year following the placement * * * substantially and continuously or repeatedly to maintain contact with and plan for the future of the child [three children] ”?[10]
On the question of “ diligent efforts to encourage and strengthen the parental relationship ” the petitioner moved in July 1971, after the filing of the petition but before the trial, to amend the petition to claim the relief from diligent efforts allowed by the June, 1971 amendment where the agency pleáds" and proves that ‘1 such efforts would be detrimental to the moral and temporal welfare of the child. ’ ’[11] Although this court ruled in an interim decision that the statute as Amended could be applied in this case,[12] the evidence submitted to this court at the trial makes it unnecessary to reach that issue in this «asé.
On the basis of 115 facts to which the parties stipulated and the testimony of the agency caseworker, the evidence establishes by more than a fair preponderance of the evidence that the petitioner exerted diligent and continuing efforts to encourage and *971 strengthen the parental relationship from 1965 when they received Dominic in care until February, 1970 when they for the first time refused further visits to the parents.
The record establishes that within two months after Dominic’s birth on October 2,1963, the mother secured public assistance and an apartment in which she lived with him for only one month. The mother then left him with an unrelated neighbor from whose home he was removed by the police to the New York Foundling' Hospital. After care in the hospital and several temporary boarding homes from December 26, 1963, to June 1,1965, Dominick was placed by the petitioner in the foster home where he has continued to live for over seven years.
Attempts by the petitioner to contact the parents in June and July, 1965 and in September and October, 1967 were left unanswered. In November, 1967, mail addressed to the mother was returned by the post office marked. “ unclaimed ”. In the absence of any responses or initiation of contacts by either parent after June, 1965, the petitioner requested the Department of Social Services for permission to plan for adoption on January 19, 1968. Nevertheless when the father called the agency in February, 1968, and the worker learned that the parents had been in a drug program she tried to help the parents to get appropriate housing and public assistance. Despite failures to keep appointments following this call the worker did arrange to have the parents see Dominic on May 15,1968.
Within a month of this visit with Dominic, his younger siblings Barbara (born April 2, 1966) and Abby (born September 1, 1967) were placed by the Commissioner of Social Services with the petitioner on June 14, 1968 for foster home care. These two children had been adjudged neglected by the Family Court on December 28, 1967, and had been removed for temporary care by the court, and subsequently placed with the Commissioner . of Social Services.
Although the parents were informed that the two younger children would also be in the care of the petitioner, n,o word was heard from either parent until the mother called in December, 1968. Again there was no follow through until the father called in February, 1969 when an appointment was made for February 14, 1969. This appointment was not kept and there was no further word from either parent until the father called on November 12, 1969. Despite all past failures, the petitioner arranged for a family reunion for the parents with the three children on December 9, 1969, but the parents did not appear. One more such family reunion was planned for January 14, 1970 and this time the parents did appear.
*972 On reviewing the record, the Edwin Gould Services cafhe to the judgment in February, 1970 that to arrange for further visitation by the parents would not be in the best interest of the children. At that time Dominic had spen,t at most three months of his life with his mother, and had beén visited since 1965 only twice in 1968 and once in 1970, or a total of three times in over four and one-half years. Barbara and Abby had been in placement with the petitioner since June 14, 1968 and had been visited by the parents at only one family reunion on January 14, 1970, ohe year and eight months after placement with the petitioner.
This record provides clear and convincing evidence that the petitioner made repeated and diligent efforts despite the noncooperation of the parents to encourage and strengthen the parental relationship for a period of over four and one-half years. The agency was certainly under no statutory duty to continue its efforts when it came to the conclusion that to do so would be injurious to the children or contrary to the best interest of the children. By promptly advising the father of the agency’s decision to terminate visits and of his right to counsel so that the court could determine the issue of permanent neglect, the agency acted in forthright fashion and exercised its responsibility both to the children and to the parents.
That the agency came to be convinced that adoption would be in the best interests of the children is no bar to a finding of permanent neglect. Nor can the diligent efforts required by the statute prior to 1971 be interpreted to require efforts without end to the-detriment of a child. (Matter of Klug, 32 A D 2d 915.)
This record, likewise, provides clear and convincing evidence that the parents, notwithstanding the agency’s efforts, have failed for periods of far more than one year following placement of their three children substantially and continuously or repeatedly to maintain contact with their children, and plan for their future. No meaningful contacts have been maintained by the parents since the placement of the children with the petitioner. The occasional and sporadic requests to visit with no follow-through, followed by repeated absences of long duration, do not fulfill even minimal parental obligations and cannot be regarded as beneficial to the children. (Matter of Clear, 65 Misc 2d 323; Soames v. Spence-Chapin Adoption Serv., N. Y. L. J., Feb. 1,1972, p. 16, col. 6-.)
The duty to plan for the future of children in placement is not an alternative obligation but an additional responsibility of parents. (Family Ct. Act, §§ 614, 622.) However, even if this *973 were not so, the record negates respondents ’ conclusion that their search for a drug rehabilitation program suited to their needs constitutes planning for the future of their children. Serious and continuing drug involvement with intermittent efforts toward freeing themselves of their habits in a succession of detoxification and treatment programs followed by return to the use of heroin cannot be viewed as supporting the contention of serious planning or the ability to plan for the future of the children. Planning by a parent for the future has been interpreted to mean to formulate and to act to accomplish a feasible and realistic plan for a child. (Matter of Stephen B., 60 Misc 2d 662.)
Finally, respondents urge that the court should take into consideration that their failure to maintain contact with their children must be weighed in the light of the “ class mores of poor, black, and unschooled persons ”, and the “ impossible barriers ” created by requirements that they comply “ with the customs of bourgeois urban existence ”. Counsel for the respondents states that respondents concede with hindsight that they “ should havé acted the way our society demands all its members act, with civility, urbanity and deference ”. No such demands were made by the petitioner in this case, and respondents ’ rationalizations seem rather to be a belated attempt to justify their continuous failure to function as parents throughout the lives of their children. The plea of counsel seems to urge that to understand all concerning the problems of the parents must result in excusing all that parents do to or fail to do for their children.
This plea must be rejected. To accept it would constitute regression to the period when the rights of parents were treated as absolute, and would negate the rights of children as developed by the Legislature and courts of the State of New York. It would require courts to sanction less protection for the children of poor, black and uneducated parents than for children of more privileged parents, thus violating their constitutional right to equal protection under the law.
The three children, Barbara, Dominic, and Abby P. are adjudicated to be permanently neglected children as defined by article 6 of the Family Court Act. In view of the record in this case this court finds that the moral and temporal interests of these children require that the custody of the parents be permanently terminated. Custody of the three children is awarded to the petitioner so that the children may be freed for adoptive placement, and petitioner is directed to proceed to secure such adoptive placement as speedily as possible.

. Professor Joseph Goldstein, Address on the Occasion of the Twentieth Anniversary of the Hampstead Child Therapy Clinic, London, July 1972.

. (L. 1969, eh. 640, § 2, eff. July 1, 1969.) In referring to the 1969 amendment Surrogate Midonick wrote: “ At long last we see the Legislature coming to grips with the basic conflict between parental rights and infants’ rights. Too often a preoccupation with parental rights tends to blur the essential right of an infant to end the limbo of foster care (or shelter boarding care) and secure a permanent parental home either with his natural or adoptive parents. Parental ‘ rights ’ must not be emphasized to the point of denying the child a parental ‘ home.’ ” (Matter of Jennifer “ S ”, 69 Misc 2d 942, 946.) In the final decision of this case (p. 955) Judge Mbdonick made a finding of abandonment and gave guardianship to the agency having the child’s custody with authorization to consent to adoption. It is noteworthy that in doing so the Surrogate stated: “now hold, that children too have a right to the protection of due process of law, and that a combination of parental abandonment and agency failure to promote the parent-child relationship cannot override the substantial best interests of an innocent child, finder both section 384 of the Social Services Law and sections 611, 614 and 622 of the Family Court Act.”

. (L. 1971, -ch. 901, § 2, eff. June 25,1971.) The State Department of Social Services, in a memorandum, favoring the proposed amendment, supported the requirement that an authorized agency should make diligent efforts to strengthen the relationship between the child and its parents but only when if is alleged and proven that such efforts will not be detrimental to the moral and temporal .welfare of the child. (Memorandum dated March 16,1971; N. Y. Legis. Annual, 1971, p. 256.)

. Who May Need Adoption Planning. Prepared by Bellisfield, Pettifórd, Allen and H:« - * p. x, 2,19, 32, 52.) 5. L. 1971, ch. 97, § I. x, 2,19, 32, 52.)

. ;I:i. 1971 cli. 97 § I.

. L. 1972, eh. 940, § 1, eft July 8, 1972. See, also, Quarterly Journal published by the National Juvenile Court Foundation and the National Council of Juvenile Court Judges, vol. 23, No. 1 winter 1972. Handbook for New Juvenile Court Judges, eh. VII, entitled? Neglect, Dependency, Child Abuse and Protective Services, p. 27: “ Children’s needs are present every day and require satisfaction on a daily basis. Rejection, neglect, abuse, and the feeling of not belonging can cause irreparable damage in a short time. Thus it behooves the court to not permit neglected children to ‘ get lost in the shuffle ’, and reviews or report hearings should he held at least every six months to ensure proper efforts being máde to either return the child to the parents or proceed with a petition for permanent deprivation, to permit adoption.”

. Family Ct. Act, art. 6, § 614, subds. [a], [b].

. Family Ct. Act, art. 6, § 614, subd. [c]; § 622.

. Family Ct. Act, art. 6, § 614, subd. [c], as amd. L. 1971, ch. 901, § 2.

. Family Ct. Act, art. 6, § 614, subd. [d]; § 622.

. Op. cit., n. 9.

. January 6, 1972 decision.