Joseph A. Doran, J.
This is a proceeding brought by the Orphan Asylum of the City of Brooklyn (hereinafter called "Brookwood” or the "agency”) to obtain the commitment, *411 custody and guardianship of a 12-year-old boy for purposes of adoption (Social Services Law, § 384),. and for termination of parental rights in said child (Family Ct Act, § 611 et seq.)
This child — Derek—was born to his mother out of wedlock on October 2, 1963 — the youngest of six children at the time of birth. The agency assumed responsibility for his care on December 17, 1965, when he was transferred to Brookwood by the Commissioner of Social Services of the City of New York. He was placed in a foster home selected by the agency, and has continued to remain there.
The respondent is the mother of the child in question, who refuses to relinquish her natural rights in favor of strangers.[1] However, it is claimed that she has forfeited her rights to the child by reason of "abandonment” as the term is used in the statute (Social Services Law, § 384), and also on grounds of "permanent neglect” in that she has failed to maintain substantial and continuous or repeated contact with the child in accordance with the requirements of law and plan for his future, although physically and financially able to do so, notwithstanding the agency’s diligent efforts to encourage and strengthen the parental relationship, so as to require, therefore, a termination of parental rights in the moral and temporal interests of the child (Family Ct Act, § 614).[2]
At the outset the court takes judicial notice of its own records that relate to the proceeding before it. (See United States v California Canneries, 279 US 553, 555; Dimmick v Tompkins, 194 US 540, 548; Matter of Ordway, 196 NY 95, 97; Vose v Yulee, 64 NY 449, 452; Devine v Melton, 170 App Div *412 280, 282; Silverstein v Brown, 153 App Div 677, 680; O’Grady v State of New York, 118 Misc 693, 696.) It appears that the Commissioner of Social Services of the City of New York filed a petition verified June 1, 1973, for review of the foster care status of the child under section 392 of the Social Services Law. It stated that the said child had been in foster care since December 17, 1965, under agency auspices. The petition also alleged as follows: "3. Petitioner is charged with the care, custody and guardianship of said child, in that the child came into the Commissioner’s care through the Commissioner exercising his mandated responsibility on February 11, 1965. No commitment was signed by the mother. * * * 6. That it would be in the best interest of the child to continue in foster care because it would be contrary to the welfare of the child to return to his home.” (Emphasis supplied.) The court by order (undated) directed that notice of the presentation of the petition and hearing thereon be given to the mother (respondent herein) by "service of written notice” 10 days before the date of hearing without prescribing any particular manner of service of such notice (see Social Services Law, § 392). It was served by mail on November 28, 1973, pursuant to the usual practice and procedure in such cases, and returned by the Post Office for "addressee unknown”. On December 6, 1973, an order was made ex parte in the section 392 review that the "foster care of named child be continued in the care and custody of the Commissioner of Social Services of the City of New York”, and that Brookwood "continue to proceed on behalf of the child, if legal grounds exist, to legally free said child for adoption.” (Emphasis supplied.)[3] A copy of the said order mailed to the same address given for the mother was also returned by the postal authorities as undeliverable.[4]
*413 The stage was thus set for the instant proceeding. Now for the ñrst time the respondent has been given the opportunity for hearing in any court after her son was taken 10 years ago at the age of 16 months under somewhat questionable circumstances. In February, 1965, the mother and six children (including Derek) were living on public assistance in a so-called "welfare hotel” with a dole of $42 semi-monthly for food. The children of school age were kept home for lack of proper clothing. One day — as the respondent explains it — a Department of Social Services caseworker came with a check for school clothes. The mother was told that she could leave the children alone while she went shopping — just as she did when she went to pick up her "welfare” check. On her return the children were gone, and Derek has never been given back to his mother. It appears that a criminal charge was dismissed at a later date. The removal of the children in the mother’s absence is said to have been effected under the "emergency removal powers” of the Commissioner of Social Services at the time (see Family Ct Act, former § 324, now § 1024).[5]
However, there has never been any judicial proceeding to authorize or confirm the legal propriety of such removal that has separated mother and child for a decade as aforesaid. Indeed, none is claimed — anymore than a written consent or surrender of the child is claimed to justify the action. Shortly put, the "separation” over the years has been without legal sanction and in plain violation of law (Matter of Daniel C, 47 AD2d 160, 163; People ex rel. Johnson v Michael, 39 Misc 2d 365).[6] This circumvention of law is tolerable only because the child has always continued in foster care with the mother’s *414 consent. All parties in interest have been accepting of the arrangement.
The child in this case is said to have neurological and perceptual problems stemming from minimal brain damage and poor vision. He also has learning disabilities that require special schooling. The record is silent as to the precise nature and extent or depth of his difficulties.[7] The agency has always taken the position that the mother is unable to provide for his needs, which are being better served in foster care. The respondent recognized Derek’s problems, and has acquiesced in the agency’s appraisal of her inability to cope with them. Accordingly, she made no plans for bringing the boy home until these were corrected — burdened as she was (and still is) with the other children and now grandchildren in the family. Brookwood left it to the mother’s decision as to when she would be ready.
The agency stopped home visits for the child when he complained to a caseworker in or about December, 1968, that they made him unhappy. Derek, is supposed to have said that he was not properly fed, received no attention, and felt lost with a whole lot of children in his mother’s home. Whatever he meant, the agency was quick to lend a ready ear to a five-year-old boy with Derek’s limitations at the time. Derek also did not like the discipline at home. It was apparently stricter than the routine to which he had become accustomed in foster care. The court further notes — if trivia be deserving of notice —that the agency caseworker would fault the respondent for paying little or no attention to the child on the occasion of a picnic in August, 1971. It is said that he was left by his mother to do only what comes naturally: "Derek was just playing with his siblings”.
After the agency put an end to home visits, the burden of responsibility was placed on the mother to arrange for office visits every month, or two months, or three months, or whenever she felt able to come and visit with the child. Nevertheless, her requests were repeatedly turned aside on one excuse or another: Derek on vacation — illness—interference with schooling — death in foster family or away on business — or some other reason. The caseworker for Brookwood testified *415 that there was no visiting from 1971 to 1974 — except, perhaps, a few sporadic or occasional visits according to the respondent’s account. The agency’s "diligent efforts” during this period seem to consist of an attempt to discuss Derek, his problems, and his future apparently in October, 1972, and a subsequent letter or two to the mother. When the respondent asked to see Derek in 1973, she was told that she could not see him for a year, at the end of which the caseworker would contact her. The agency thought it best that the mother not see the child because it upset him, and also he was attending a special school. The last request for a visit with her son was made by the mother in February, 1974, and denied by the Brookwood caseworker in these words: "I told her that in the best interest of Derek that the agency felt that Derek should not see his family whatever because we are in the process of going to have him freed for adoption.” When asked for a surrender of the child at that time, the respondent refused to sign him away. It took another eight months before Brook-wood was given approval and permission by the Commissioner of Social Services (Bureau of Child Welfare) to bring this proceeding for termination of the parent-child relationship.
The respondent always continued to express an interest in her son and have him back some day. At no time was she willing to give up her child. She listened to the advice of the agency caseworkers because she "figured that they knew better”. Unable to have the boy home because of circumstances with which she was receiving no help, it was the mother’s suggestion — and still is — that Derek remain in foster care until 15 or 16 years of age, when he will be old enough to decide for himself whether he wishes to return to her or remain with the foster parents.
The respondent maintained relatively close ties and frequent contact with Brookwood through the Mothers’ Club until the group was disbanded towards the end of 1972. The agency caseworkers regarded the mother as hostile and uncooperative. They were unable to develop a working relationship. Their frustrations were matched only by the respondent’s own resentment of the way Brookwood was treating her. Derek has nevertheless survived fairly well in the midst of these antagonisms, albeit conditioned in outlook. It is understandable that he should tell the court "I don’t know that woman” — his mother — and did not like her. He wants *416 adoption in the foster family.[8] This sad commentary bespeaks a lot for agency and parent in the circumstances here.
This is a statutory proceeding based on alternative theories of "abandonment” and "permanent neglect” of the child to be determined according to criteria established by law. The court is not free to ignore the definitive language of the applicable statutes (Social Services Law, §§ 371, 384; Family Ct Act, §§ 611, 614), and can interfere to alter the parent-child relationship only in accordance with the provisions of law. The instant case like all others of its kind is a hardship case with strong emotional appeal. No two cases are factually the same in this sensitive area of human relationships. Each must turn on its own particular facts and totality of circumstances (Matter of Klug, 32 AD2d 915; Matter of Barbara P., 71 Misc 2d 965, 969). There are no precedents of real value.
The court does not sit to accept a kind of "fait accompli” and apply the rubber stamp of approval to agency policy or decision belatedly reached on the eve of accountability under section 392 of the Social Services Law. (Cf. Yonkers Community Development Agency v Morris; 37 NY2d 478, 485; Matter of Butcher, 82 Misc 2d 666, 668.) The case would probably never have surfaced from the so-called "limbo” of foster care for Derek, if it were not for the section 392 review of his status mandated by law. The agency then proposed that the child be freed for adoption as soon as it received permission to bring the proper proceeding. This has all the appearance of a convenient afterthought in anticipation of the section 392 hearing. The situation never changed and was always the same for Derek throughout his years in foster care. Nevertheless, the court may not abdicate its obligation to follow the law in favor of social planning. When drained of emotion, the case at bar has little to recommend it in terms of legal merit no matter how good the sociology.
There was no abandonment of the child in question within the meaning of the law. The statute, in pertinent part, says than an "abandoned child” is one who has been (1) abandoned or deserted in any place, and (2) left by parent having custody *417 without support or visitation for at least six months without good reason (Social Services Law, § 371). The respondent, however, did not abandon or desert this child anywhere. For instance, he was not a foundling left in the hallway of a tenement or the vestibule of a church. These are familiar cases without, of course, excluding other possible situations. Derek and his siblings were only temporarily left alone while his mother was on a shopping errand for them. They were missing when she came home — taken pursuant to some official "emergency removal powers” in the meantime. If Derek was abandoned on this occasion, so were the rest of the children. Yet, as already noted, the latter were eventually allowed to return to the mother and have remained with her. If the respondent has not seen this child for six months or even longer prior to commencement of this proceeding, it is with good reason and excusable on this record. The agency would not let her and always found excuses. No one questions her inability to contribute towards his support.
In some cases the court has borrowed the requirement of diligent efforts to maintain the parental relationship from the "permanent neglect” statute (Family Ct Act, § 611 et seq.), and made it part of agency responsibility in a proceeding for guardianship under section 384 of the Social Services Law (see Matter of Anonymous [St. Christopher’s Home], 48 AD2d 696; Matter of Vanesa "F”, 76 Misc 2d 617; Matter of Jennifer ”S”, 69 Misc 2d 942, 951; Matter of Ellick, 69 Misc 2d 175). If appropriate, it only makes for a weaker case in this instance. As the court reads the record, it is enough to say that such efforts appear to be conspicuous by their absence. Ordinarily, a refusal to cooperate with a diligent agency reflects the parental attitude towards a child and can have some bearing on intention.
The mother of this child continued to have an interest and concern for him with the expectation that some day he might return to her with agency approval. The time has not arrived according to Brookwood, and seems to lie in the distant future. The mother’s hope and expectation, however, belie any intent to abandon the child. The concept of abandonment implies intention to repudiate or renounce all rights and responsibilities of parenthood and a settled purpose to be rid of them. (See Matter of Maxwell, 4 NY2d 429; Matter of Bistany, 239 NY 19.) The court looks for a considerable degree of clearness and certainty in making such determination. The *418 fact that the respondent has consented to the child remaining in foster care these many years does not rise above the level of voluntary acquiescence that his needs be satisfied by those represented as having the greater capability to provide for them. It is by no means a renouncing or forsaking of the child with an intent to abandon him. (Cf. Matter of Karr, 66 Misc 2d 912, 914.)[9]
The petitioning agency has failed to show abandonment by the mother so as to justify committment of the child to its custody and guardianship pursuant to the provisions of section 384 of the Social Services Law (see Matter of Lewis, 35 Misc 2d 117, affd 19 AD2d 621). To summarize, here also as in Matter of Anonymous (St. Christopher’s Home) (48 AD2d 696, 697, supra), it is equally true that the evidence demonstrates "a systematic tendency to discourage the natural mother and to favor the foster family. * * * [T]he home was itself dilatory in the performance of its duty under sections 611 and 614 of the Family Court Act to 'strengthen the parental relationship’. There was no indication, other than the natural mother’s failure to contact the home, that efforts to strengthen that relationship would be 'detrimental to the moral and temporal welfare of the child’ (Family Ct Act, § 611). There was no evidence of an emotional disturbance or sociopathology on the part of the natural mother which would contraindicate such efforts * * * Absent such factors, there was no excuse for the home’s failure to encourage and strengthen the parental relationship. Accordingly, petitioner failed to sustain its burden of proving that the infant was an abandoned child.”
*419 Next to be considered is whether the petitioner has made a case of "permanent neglect” according to law (Family Ct Act, §§ 611, 614, 622). "[T]he statute should be construed in favor of the mother because of the human relationship,” said the court in Matter of Anthony "CC” (48 AD2d 415, 418-419), and reaffirmed its earlier holding in Matter of Peter "DD” v St. Lawrence County Dept. of Social Servs. (48 AD2d 956), that section 611 of the Family Court Act "is extremely harsh and seems contrary to human instincts and should only be implemented under the most stringent circumstances.” Recognizably, there are proper cases for a finding of "permanent neglect”, and these two decisions are themselves sufficient authority. However, the right of parents to their children "has ever been regarded, even in primitive civilization, as one of the highest of natural rights” (Matter of Livingston, 151 App Div 1,7). Unless values have changed, it is entitled to no less respect and protection in this day and age of enlightment. The Legislature cannot have intended the termination of a relationship so fundamental to our society without strict proof of "permanent neglect” by statutory standards.
The court put it succinctly in Matter of Ray A.M. (Sugarman) (37 NY2d 619, 623): "Section 611 of the Family Court Act defines a 'permanently neglected child’ as one under 18 years of age who has been placed in the care of an authorized agency, and whose parent, although physically and financially able to do so, has failed for a period of over one year 'substantially and continuously or repeatedly’ to maintain contact with or plan for the future of the child. This failure must be despite the agency’s diligent efforts’ to encourage and strengthen the parental relationship, if such efforts 'will not be detrimental to the moral and temporal welfare of the child’ (see, also, Family Ct Act, § 614, subd 1, par [c]).” (Emphasis supplied.) It should also be observed that an agency’s "assumption of its own rectitude in the handling of what is one of the insoluble problems in a particularly disturbed part of our society” is not above criticism and does not carry its own acceptance (see Matter of Irene O., 38 NY2d 776, 778; Matter of Joyce Ann R, 82 Misc 2d 730, 732).
This gives perspective and turns inquiry in the right direction. On the evidence it cannot be said that Brookwood extended itself by diligent efforts to promote the parent-child relationship. This responsibility was given minimal recognition at best. The agency picked the foster parents here. The *420 heavy investment of service to the foster family necessarily worked against any plan of reunion between mother and child. There is no proof — and, indeed, the record does not even suggest it — that such efforts would have been detrimental to the moral and temporal welfare of the child. The respondent was not an unfit mother due to alcohol addiction, drug usage, mental illness, behavioral deviation or other vice found to exist in many of the cases terminating parental rights. (See, e.g., Matter of Irene O., supra; Matter of Ray A.M., supra; Matter of Anthony "CC”, supra; Matter of Barbara P., 71 Misc 2d 965, supra; Matter of Stephen B., 60 Misc 2d 662, affd sub nom. Matter of Behrman, 34 AD2d 527.) The predicament of this mother — even as Brookwood seemed to view it — was somewhat akin to the "old woman who lived in a shoe.” If Derek has problems, it is reason for greater demands — not less —on agency time, energy and resources to give supportive help to the mother in dealing with them. The fact is that Brookwood did not adequately respond to the needs of the situation. It failed to encourage the respondent to deal with the child’s problems in light of her home circumstances, and even discouraged contact as harmful interference with his progress in foster care.
The agency urges that the mother has no plan for this child. It is the "kettle calling the pot black.” Brookwood — which is under a legal duty to exercise diligent efforts to promote the parental relationship (Family Ct Act, § 611) — has no plan other than freeing the child for adoption and relieve itself of further obligation. Its dilemma is real. The agency position is contradictory and inconsistent on its face. Brookwood would fault the respondent for lack of plan for the future of the child, when its expressed intention is not to return him to the mother’s custody. In short, it condemns her for a failure to plan against a hopeless future. If this adds up to the diligent efforts required of the agency under the law, the court fails to see it in that light.
The respondent is thus placed between Scylla and Charybdis: plan or no plan is all the same if Brookwood has its way. But careful navigation can avoid both dangers. Still, it is not altogether correct to say that the mother has no plan for her child. She is prepared to have him any time the agency finds that Derek is ready to go home and offers all the necessary supportive assistance. Derek may stand in the path of fulfillment, of course, and his mother knows it. Nevertheless, she *421 cannot be charged with indifference to his welfare in accepting and following agency advice and persuasion that she is not as well able to provide for his special needs as the foster parents. The respondent is clearly at a disadvantage vis-á-vis the agency. They "cannot be viewed as equals in the planning process” (Matter of Joyce Ann R, 82 Misc 2d 730, 733, supra), and "[a]gency efforts correlative to their superiority are obligatory” (Matter of Sydney, 84 Misc 2d 932, 934). It is much too convenient to seize upon the mother’s frustration on one occasion long ago when she said that she wanted no help from the Brookwood caseworkers. These are idle words that the agency would turn to its own advantage. Instead of accepting the challenge — if such it be — Brookwood was satisfied to leave well enough alone. It is easier that way.
The realities of the situation are that Derek does not really know his mother, that she is unable to meet his special needs if we accept agency standards and opinion, and that the foster family of 10 years is meeting these needs and willing to adopt him. None of this is a substitute for law. The court can terminate parental rights only where the parent has failed to maintain contact or plan for the child despite the agency’s diligent efforts in accordance with the law. More is needed than has been shown in this case before the court will take this extreme and drastic step.
In passing, some reference should be made to the recent guidelines issued by the New York City Department of Social Services (Human Resources Administration) on the subject of parental visiting with children in foster care.[10] This assumes critical importance if the "life-line” between parent and child is to be maintained by any agency having a child in foster care. There has been marked inconsistency and inadequate policies in this area. The official statement condemns the restrictive practices that have developed over the years, and says that these must be changed in order to address the real needs of parents and children in foster care. The convenience of agency and foster home is relegated to secondary importance. The fact is noted that a child may become unhappy and difficult to handle after contact with parent, but the response must be not to eliminate visits, only exert more diligent efforts in working with parent and child. It is difficult not to see the application here.
*422 Accordingly, the petition herein is dismissed on the merits for failure to meet the statutory requirements for "abandonment” or "permanent neglect” of the child (Social Services Law, §§ 371, 384; Family Ct Act, §§ 611, 614, 622). The point of decision is confined to the present state of affairs on thé record. There is no need to rush for adoption as the answer to Derek’s problems of the moment if, in truth, he has any. For most children in foster care the idea of adoption is the attribution of desire in the minds of the social planners as being in their best interests. This is not necessarily true, nor always desirable. In any event Derek still has time.
This decision does not in any way affect the custody of the child with his "psychological” parents in the foster homé that is truly his only home at this relatively late stage in his young life. Much has been written about a child’s right to a stable home and the secure environment of family surroundings. There is none to gainsay it. Derek has had this stability and security for 10 years with all the care, nurturing and love that foster parents can give him. It is not about to be disturbed, but this is quite beside the point where statutory standards must be satisfied as a basis for decision. (Cf. Matter of Bistany, 239 NY 19, 24, supra.) The status quo — with which Derek is comfortable — is not being threatened by his mother. It is most likely that any attempt to alter it — not contemplated by the respondent — would meet with failure (see Matter of Daniel C., 47 AD2d 160, supra; Matter of Joyce Ann R, 82 Misc 2d 730, supra). It is advisable, as the court believes, to leave things as they are in the circumstances of this case.[11] It also leaves the "thirteenth labor” of Hercules to Brookwood — part of its own making — to encourage and strengthen the parental relationship between mother and child pending the next review under section 392 of the Social Services Law. It also alerts the mother of the child to a deep sense of responsibility, if encouraged by the agency through apparently needful aggressive efforts. Needless to say, the court does not expect achievement of the impossible. It is actions rather than words that will evidence good faith on the mother’s part so long as the agency does the job that is given to it under the law and *423 documents its diligent efforts. Nothing decided at this time is res judicata in any subsequent proceeding on new facts supporting the statutory grounds for similar relief.[12]

. The natural father has not been made a party since he signed a voluntary surrender and consent to adoption of the child. The foster parents, with whom the child has been living for 10 years, have not sought to intervene in the proceeding. (Cf. Matter of Laura Ann, 82 Misc 2d 776; Matter of Jacqueline J., 74 Misc 2d 254.) There is an identity of interest with the agency here, since the foster parents are the prospective adoptive parents if the child should be freed for adoption upon termination of parental rights.

. The statutory definitions relevant to this case are as follows: An "abandoned child” means one who is "abandoned or deserted in any place * * * by the parent having its custody * * * and left * * * (c) without being visited or having payments made toward his support, for a period of at least six months [formerly one year], by his parent * * * without good reason” (Social Services Law, § 371). A "permanently neglected child” is one in the care of an authorized agency whose parent has failed for a period of more than a year "substantially and continuously or repeatedly to maintain contact with and plan for the future of the child, although physically and financially able to do so, notwithstanding the agency’s diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the moral and temporal welfare of the child” (Family Ct Act, § 611).

. On a section 392 review the parent is entitled to a plenary and evidentiary hearing. In this instance, the court made its determination on the papers only and chose the most drastic rather than the least restrictive disposition available to it. (See Social Services Law, § 392.) The recent statutory amendments contemplate changes in the procedures of the past. The parent is now entitled to know the alternative dispositions in advance of hearing (see L 1975, ch 708). And the order of disposition must include the court’s findings in support of its determination that such order is in the best interest of the child (see L 1975, ch 342).

. The respondent testified that she had moved from the address to which notices were sent and had no knowledge of the section 392 proceeding. There was also testimony by a Brookwood caseworker that she did not know whether the respondent received any notification of the said proceeding. There should have been no difficulty in locating the respondent for personal service of notice of the section 392 review, or even a correct address for notice by mail, since she was receiving public assistance *413 from the Department of Social Services in the City of New York. There was no apparent difficulty in effecting service of process in the proceeding at bar.

. It appears that Derek’s two oldest siblings were returned within two or three months, and the next three were kept by the mother after a home visit in August, 1969, to remain with her ever since. There has never been any complaint or protest by agency or anyone. The court sustained objection to preferred testimony in respect to these children while under the respondent’s care and supervision. Such testimony is irrelevant to the issues as defined by statute in this case (see Social Services Law, §§ 371, 384; Family Ct Act, §§ 611, 614) regardless of relevance, if any, at the dispositional stage of a "permanent neglect” proceeding (cf. Matter of Holly ”E”, 45 AD2d 893, 894). However, the court took an offer of proof to complete the record. Concededly, no child protective proceeding charging "neglect” of her children has ever been brought against the respondent under article 10 (formerly art 3) of the Family Court Act.

. See Social Services Law, §§ 383, 384, 398; Family Ct Act, former §§ 321, 324-326, now §§ 1021, 1024-1027.

. Derek was normal enough in appearance, manner and response during an in camera interview. The court found nothing unusual about him other than the fact that he was wearing heavy- — lensed glasses.

. This 12-year-old boy can hardly be expected to appreciate the full meaning and legal consequences of adoption. His immature wish and desire is largely emotional and the product of inevitable psychological conditioning. It is by no means determinative in a case like the present that entails far-reaching and life-long effects. (Cf. Obey v Degling, 37 NY2d 768, 770.) Should the day of repentance and change of mind ever dawn, then would come the real tragedy for Derek.

. The court is aware of those cases which seem to hold that intent is not an element of abandonment save for the six-month period in which a parent has failed to visit or support a child in agency care without good reason (see Matter of Tyease ”J”, 83 Misc 2d 1044, 1049; Matter of Vanesa "F”, 76 Misc 2d 617, 621, supra). These holdings would, in effect, write half the definition of "abandoned child” out of the law (Social Services Law, § 371) if the Maxwell-Bistany concept is viable and has any meaning at all in the statutory scheme of things. (Cf. Matter of Commissioner of Social Servs. [Coddington], 84 Misc 2d 253, 257.) This stresses the need for a fully intentional act by parent to relinquish all claim to a child. There is no indication that the Legislature meant to dilute it. It is almost unthinkable that the Legislature had in mind the severance of a relationship that began at birth solely because of parental laxity in performance of an obligation to visit or support a child for a length of time no longer than the baseball season. There must be something more under any rational system of law in a civilized society. The frailties of human nature demand a reasonable time for repentance. This, indeed, underlies the availability of alternative dispositions (including suspended judgment) suited to the circumstances in a "permanent neglect” case (see Family Ct Act, §§ 631-634).

. See Policy Statement on Parental Visiting, New York City Department of Social Services, Carol J. Parry, Assistant Commissioner, September 16, 1975.

. The Law Guardian appointed for the child and as an aid to the court "in making reasoned determinations of fact and proper orders of disposition” (see Family Ct Act, §§ 241, 242, 249) has recommended that the best interests of Derek require that he remain with his foster parents. As indicated, this is precisely the court’s view and determination. "[T]his highly competent neutral submission is reassuring” (Matter of Ray A.M. [Sugarman], 37 NY2d 619, 624, supra).

. In a proceeding under article 6 of the Family Court Act (§ 611 et seq.) to determine "permanent neglect”, the petition must be dismissed unless the allegations are sustained by a preponderance of the competent evidence at the "fact-finding stage” of New York’s distinctive procedure (see Family Ct Act, §§ 622, 624, 632). Even if the petition should be sustained at this stage, it does not follow by any means that a parent’s rights will be terminated prior to a "dispositional hearing” to determine whether the parent’s custody be ended in the interest of the child (see Family Ct Act, § 623). The statute contemplates investigation and reports (after a "fact-finding”) by the probation service or agency for dispositional purposes, which may result in a judgment terminating the rights of a parent or suspended judgment for one year on terms and conditions defined by rules of court relating to the acts or omissions of the parent (see Family Ct Act §§ 625-626, 631-634). The procedure is exemplified in Matter of Lewis (41 AD2d 619).