Hugh R. Elwyn, J.
Each of the respondents’ three children have been adjudicated to be neglected children within the meaning of article 10 of the Family Court Act and placed with the Commissioner of Social Services for an initial period of 18 months, subject to the further order of the court. Tina Frances Apel, age five, has been in foster home placement since November 20, 1973; John Santosky, age three, since September 30, 1974 and Jed Conrad Santosky, age two, since September 30, 1974. The court takes judicial notice of its own records that relate to the proceeding before it (Matter of Denlow, 87 Misc 2d 410, 411-412, and cases there cited).
Upon the most recent application for an extension of the placement of the child, Tina Frances Apel, this court, after an extensive hearing, in a written opinion granted the commis *732 sioner’s application for a one-year extension and by its order of December 31, 1975 ordered that:
1. The Commissioner of Social Services and his duly authorized agents undertake renewed diligent efforts to encourage and strengthen the parental relationship;
2. The Commissioner of Social Services formulate a specific plan of action for the implementation of this directive which shall include, as a minimum, plans for assisting the respondents by every feasible means in obtaining adequate housing, employment, family counseling, medical and psychiatric treatment;
3. The commissioner report such plan to the court within 30 days and keep the court advised of progress toward the goal of returning the child to her natural parents at the earliest date consistent with the child’s safety and welfare.
Pursuant to the court’s order the Commissioner of Social Services on January 28, 1976 filed a written "Plan of Service for Tina Frances Apel and Annie and John Santosky”, which plan was approved by the court and which has been deemed to be applicable to the two other Santosky children who are similarly situated.
Seven months later on September 8, 1976, the Commissioner of Social Services and his authorized deputies, thoroughly frustrated in their efforts to implement their plan of services to the Santosky family and apparently convinced of the futility of further efforts to upgrade the level of the Santoskys’ parental capacities to a point where the children could safely and prudently be reunited with their parents, filed petitions under article 6 of the Family Court Act charging the respondents with permanent neglect. The petitions contain all the necessary allegations required by section 614 of the Family Court Act.
Although the petitions allege that "notwithstanding your Petitioner’s efforts, said parent has failed for a period of more than one year following the placement or commitment of said child to the care of your petitioner, substantially and continuously or repeatedly to maintain contact with and plan for the future of the child although physically and financially able to do so” (Family Ct Act, § 614, subd 1, par [d]), it was not contended nor was any proof offered at the +*4al that the parents had failed to maintain contact with the^ children. The commissioner relies solely upon the parents alleged "fail *733 ure to plan for the future of their children” to support a finding that the Santosky children are permanently neglected (Matter of Orlando F, 40 NY2d 103).
The supervisor of the child abuse and neglect unit of the County Department of Social Services and the case worker in charge of the Santosky case each detailed at length the agency’s multifaceted efforts to encourage and strengthen the parental relationship through the implementation of the plan for services, both before and after the plan was reduced to writing at the direction of the court. Such efforts consisted of, among other things, offering to the Santoskys the services of two mother’s aides and a nutritional aide to assist in the improvement of home management skills; staff from the public health nursing service which offered the services of a well baby clinic; the services of the Family Service Center to counsel and aid in family planning; the psychiatric and psychological services of the Southern Ulster Mental Health Center and, for Mr. Santosky, job training through the office of Vocational Rehabilitation and Gateway Industries. In addition to all these services the Santoskys continued to receive all public assistance benefits from the Department of Social Services, including food stamps and Medicaid for themselves and new born baby. In short, ever since the Santosky children have been in foster home placement, the parents have not only had offered, but diligently urged upon them, every social service available in Ulster County which could conceivably have helped the Santoskys in achieving a goal of the eventual reunion of the family.
I am satisfied that the preponderance of evidence in this case supports a finding that the Ulster County Department of Social Services has indeed made diligent efforts to encourage and strengthen the parental relationship, albeit with minimal success. All three children who are but five, three and two years of age are found to be under 18 years of age and are presently in the care of the Ulster County Department of Social Services, an authorized agency.
Consequently, the court finds that the allegations of section 614 (subd 1, pars [a], [b], [c]) of the Family Court Act are supported by a fair preponderance of the evidence (Family Ct Act, § 622). The more difficult and troublesome question is whether the allegation required by section 614 (subd 1, par [d]), i.e., the respondents’ failure to "substantially * * * plan for the future of the child” has been satisfactorily proven. To *734 this question, which merits some discussion, attention is now turned.
FAILURE TO PLAN
"A finding of a failure to plan, in and of itself, suffices to support a determination of permanent neglect (see Matter of Barbara P., 71 Misc 2d 965).” (Matter of Orlando F, 40 NY2d 103, 110, supra.)
The phrase, "substantially to plan for the future of the child” has been defined by the courts in numerous decisions (see, e.g., Matter of Jones, 59 Misc 2d 69, 73; Matter of Stephen B., 60 Misc 2d 662, 668, affd sub nom. Matter of Behrman, 34 AD2d 527; Matter of Barbara P, 71 Misc 2d 965; Matter of Joyce Ann R, 82 Misc 2d 730; Matter of Orzo, 84 Misc 2d 482, 489; Matter of Orlando F, 40 NY2d 103, 109; cf. Matter of Sydney, 84 Misc 2d 932, 934) and more recently by statute (Social Services Law, § 384-b, subd [7], par [b], added by L 1976, ch 666, § 3, eff Jan. 1,1977).
In Matter of Jones (supra, p 73) the earliest reported case construing the phrase, the court said: "Construing the statutory phrase to 'substantially * * * plan for the future of the child’ in the light of the statutory purpose, the court holds that it requires the parent to plan constructively in a manner that he can and does attempt to implement. To 'plan’, according to Webster’s Dictionary, means to 'project, program, schedule’; the connotation is activist. Since the statutory mandate is that the parent plan for the child’s 'future’, it does not require the consumation of the parent’s plan to care for the child within the year of planning. However, the 'substantiality’ of the plan for the particular parent must be evidenced by his performing some act to advance its accomplishment. Unless 'substantially plan’ is so interpreted, the provision that the parent must be 'physically and financially able’ to plan (in order for his failure to do so to be significant), would be pointless, for physical or financial capability is irrelevant to a phantasy-plan.”
The definition of the phrase "substantially plan” articulated in three Family Court decisions (Matter of Stephen B., supra; Matter of Barbara P., supra and Matter of Orzo, supra) was adopted verbatim by the Court of Appeals in its decision in Matter of Orlando F. (supra, p 110) where it said: "To 'substantially plan’ 'means to formulate, and act to accomplish, a feasible and realistic plan’ (Matter of Stephen B., 60 Misc 2d *735 662, 668, affd sub nom. Matter ofBehrman, 34 AD2d 527; see, also, Matter of Orzo, supra, p 489).”
For the converse, or what does not constitute "planning” the language of the decision in Matter of Joyce Arm R. (supra, pp 732-733) is instructive. "As to the respondent, the cases establish that 'negative’ argument tending merely to veto agency proposals does not constitute planning. Standards of substantiality, constructiveness, and attempted implementation must be met (Matter of Stephen B., 60 Misc 2d 662, supra; Matter of Jones, 59 Misc 2d 69, supra.) * * * The agency must therefore perform efficiently, diligently, and in good faith. The parent must demonstrate effort, good faith, and minimum adequacy as a planning parent. (Cf. dissent in Matter of Klug, 32 AD2d 915-917).”
The foregoing case law has been codified by the enactment by the 1976 Legislature of section 384-b of the Social Services Law (L 1976, ch 666 § 3, eff Jan. 1, 1977). Section 384-b (subd [7], par [c]) now defines the phrase, "to plan for the future of the child” as follows: "As used in paragraph (a) of this subdivision, 'to plan for the future of the child’ shall mean to take such steps as may be necessary to provide an adequate, stable home and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent. The plan must be realistic and feasible, and good faith effort shall not, of itself, be determinative. In determining whether a parent has planned for the future of the child, the court may consider the failure of the parent to utilize medical, psychiatric, psychological and other social and rehabilitative services and material resources made available to such parent.”
The period of neglect required to trigger the permanent neglect statute need not be the interval immediately prior to the filing of the neglect petition (Matter of Stephen B., 60 Misc 2d 662, 667, affd sub nom. Matter of Behrman, 34 AD2d 527, supra; Matter of Joyce Ann R, 82 Misc 2d 730, supra) but may embrace earlier periods of time.
BY WHAT STANDARDS SHALL THE PARENTS BE JUDGED?
In approaching a discussion of this question the court is mindful of the admonitions of the Appellate Division, Third Department, in Matter of Peter "DD” v St. Lawrence County Dept. of Social Servs. (48 AD2d 956) where the court said: "I would caution that the section itself is extremely harsh and
*736 seems contrary to human instincts and should only be implemented under the most stringent circumstances” and also in Matter of Anthony "CC” (48 AD2d 415, 418-419, mot for lv to app den 37 NY2d 708) where upon reaffirming Matter of Peter "DD” (supra) the court said: "[Tjhe statute [Family Ct Act, art 6] should be construed in favor of the mother because of the human relationship.” (See, also, Matter of Denlow, 87 Misc 2d 410, 419, n 9, p 418.)
This court as have other courts, in previous decisions, also takes note of the disparity in the position of the agency and the parents and of the wide gulf across which, from their polarized positions, they view the problem. For instance, in Matter of Joyce Ann R. (82 Misc 2d 730, 733, supra) the court observed, "However, the agency and the natural parent cannot be viewed as equals in the planning process. First, almost by definition, the agency operates from a background of professional resources and accumulated experience; this parent from a background of mental stress, financial handicap, and insecurity.” And in Matter of Sydney (84 Misc 2d 932, 934, supra) the court noted: "The parties are by no means dealing on an equal basis. The parent is by definition saddled with problems: economic, physical, sociological, psychiatric, or any combination thereof. The agency in contrast is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority is obligatory.”
Obviously the parents’ plan for the future of their children may not be judged by the standards applicable to an affluent social elite nor, at the other extreme, are they to be judged solely in the light of the "class mores of poor, black, and unschooled persons” (Matter of Barbara P, 71 Misc 2d 965, 973). Some middle ground must be set. Yet in a modern society which likes to think of itself as enlightened and civilized there is somewhere a minimal level of parental capacity and responsibility below which, in the interest of the child, the standard cannot be permitted to fall.
The Court of Appeals in its decision in Matter of Orlando F. (40 NY2d 103, supra) was aware of the dilemma posed by the necessity for fixing some standard of performance for persons who by reason of their low level of performance as parents are charged with the neglect of their children. The difficulties inherent in the situation are, however, no reason not to attempt to measure the capabilities as parents of just such persons. Having made its decision, the Court of Appeals then
*737 attempted to set some guidelines for the lower courts in judging such parents. The court wrote (pp 111-112): "In so deciding, we take heed of the warning that: 'Substantial planning’ may appear in this discussion to demand a degree of self-awareness, insight and resolution that most people lack, especially perhaps the mother of a child in long-term foster care. Yet the statute was designed to measure the interests and capabilities of just such a person. Therefore, so that the planning requirement will not become simply a device to permit termination in nearly all cases where the other statutory conditions are met, the standards to evaluate the adequacy of the parent’s plans should not be set unrealistically high. Courts will have to act with sensitivity and care in determining whether the parent’s plans are sufficiently credible and sound to satisfy the statutory requirement.’ (Gordon, Terminal Placements of Children and Permanent Termination of Parental Rights: The New York Permanent Neglect Statute, 46 St. John’s L Rev 215, 236-237; see, also, Matter of Jones, 59 Misc 2d 69; Matter of Clear, 58 Misc 2d 699.) We need not formulate, under the instant facts, an exact standard which must be met in order to comply with the statutory mandate in light of respondent’s utter failure to exert even a minimal attempt to develop a plan for her child’s future. Indeed, each factual pattern will undoubtedly reveal peculiarities of its own but the particular facts and totality of circumstances must be scrutinized and weighed carefully in rendering decisions in such delicate human affairs (cf. Matter of Klug, 32 AD2d 915).”
It is in the light of these principles, that the adequacy of the Santoskys’ plans for the future of their children and their failure to accomplish those plans to the agency’s satisfaction must be evaluated.
THE FATAL FLAWS IN THE AGENCY’S CASE
The urgency of the children’s need for a permanent and stable home was convincingly established by the expert testimony of the director of the Albany Child Guidance Center. Nevertheless, as urgent as that need is and as commendable as is the agency’s desire to provide such a home through the medium of adoption, the agency may not be permitted to utilize the planning requirement simply as a device to accomplish that end, even though all other statutory requirements are met. "[T]he standards to evaluate the adequacy of the *738 parent’s plans should not be set unrealistically high. [This court] will have to act with sensitivity and care in determining whether the parent’s plans are sufficiently credible and sound to satisfy the statutory requirement” (Matter of Orlando F, supra, p 111).
Counsel for the agency deplores the failure of the Santoskys to articulate "their hopes, their aspirations, their dreams, their plans for any of their three children”; their lack of insight or awareness of the need to do anything affirmative to regain their children; in short, their apparent lack of love and affection for their children or concern for anyone but themselves. It must be conceded that there is no proof that the Santoskys ever "formulated a plan” themselves. On the other hand, no one ever told them that they had to do so or risk the permanent loss of their children. It was enough, they thought, to try their best to meet the agency’s demands upon them in implementation of the agency’s plan — the only real plan for the future of the children. "Neither articulation nor abstract reasoning are a sine qua non to compliance where purposeful acts are significantly present” (Matter of Sydney, 84 Misc 2d 932, 934, supra).
With respect to the agency’s plan, the Santoskys were at first nonresponsive, even hostile; to this day there remains, particularly within Mrs. Santosky, a deep seated resentment and bitterness toward the agency, its personnel and its plans for their betterment for what she regards as an unwarranted interference with her family. Yet in spite of this smoldering resentment, the proof shows that the Santoskys have, since the formulation of the agency’s written plan and particularly in the last several months before the trial, been at least superficially co-operative. Mrs. Santosky has, for instance, accepted the services of a mother’s aide and a nutritional aide and has taken her baby to a well baby clinic, and to a doctor when ill, both parents have consulted with a psychiatrist, psychologist and psychiatric social worker at the Southern Ulster Mental Health Clinic, both parents have consulted over a period of more than four months with the director of the Family Service Center and Mr. Santosky has pursued, albeit somewhat sporadically, a course of vocational training at the office of Vocational Rehabilitation Center and Gateway Industries. Moreover, since the removal of their children to foster care, the parents have moved into larger and more suitable living accommodations and have pathetically furnished the *739 children’s room with children’s furniture, toys and stuffed animals against the day of their return. Thus while they may not have taken all the "steps as may be necessary to provide an adequate stable home and parental care”, they have taken such steps as they are able "within a period of time which is reasonable under the financial circumstances available to [them]” (Social Services Law, § 384-b, subd [7], par [c]).
The agency’s diligent efforts to encourage and strengthen the parental relationship having at last begun to pay off the agency ironically now finds itself in the awkward position of attempting to denigrate the success of its own efforts in order to demonstrate the failure of the parents to plan. The agency’s chief complaint is that the Santosky’s co-operation with its plans to effect their betterment and improve their parental skills has been begrudgingly bestowed and has been at best superficial and perfunctory. Consequently, the agency’s assessment of the degree of improvement in the parents’ over-all capacity to function as adequate parents for their children is so minimal and their view of the prospects for any further improvement so bleak as, in its judgment, to render any further efforts on the agency’s part futile.
Even though the benefits so far realized from their efforts may, as the agency contends, have been minimal or even nonexistent, the proof does show that the parents have to a degree utilized the "medical, psychiatric, psychological and other social and rehabilitative services and material resources made available [to them]” (Social Services Law, § 384-b, subd [7], par [c]). The court is, therefore, willing to give the respondents the benefit of the doubt (Matter of Anthony "CC”, 48 AD2d 415, 418-419, supra) and find good faith effort on their part to co-operate with the agency in its plans for the children’s future. Such co-operation, including the move to more spacious living quarters and Mr. Santosky’s efforts to improve his job skills by attending the program offered by the office of Vocational Rehabilitation constitutes "planning” by conduct (Matter of Sydney, 84 Misc 2d 932, 934, supra). The law declares, however, that "good faith effort shall not, of itself, be determinative” (Social Services Law, § 384-b, subd [7], par [c]).
The agency’s case against these parents has within it, moreover, two fundamental and fatal flaws which prevent the court from terminating permanently these parents’ rights to their own children, despite their serious inadequacies. First, because the agency can see no tangible benefits accruing from *740 its efforts to provide services to the Santoskys and view the prospects for further improvement within any length of time that might be considered reasonable in the light of the urgent needs of the children for a stable and permanent home as hopeless, they regard their plans as a failure. In short, because plans for the children’s future, whether the agency’s plan or the parents’ plan, have yet to bear fruit, it is said, that the children’s best interests demand that these parents should suffer the permanent loss of their children. But the law does not require the consummation of the plan (Matter of Jones, 59 Misc 2d 69, 73, supra); only that the parents "formulate” a plan and "act to accomplish” it (Matter of Orlando F, 40 NY2d 103, 111, supra). While the Santoskys’ plans for the future of their children are indeed nebulous and have never been articulated, they have "acted to accomplish” the agency’s plans. If the plan is "feasible and realistic” and purposeful acts looking toward its accomplishment are significantly present, that is all that is required to thwart the law’s attempt to deprive them permanently of their children.
Secondly, the parents’ obligation to "substantially * * * plan for the future of the child” is qualified by the phrase "although physically and financially able to do so” (Family Ct Act, § 614, subd [d]), and as to that aspect of the case the petitioner’s proof will not support a finding. In construing the statute, the court cannot ignore the qualifying phrase, "although * * * financially able to do so” for in construing a statute the court must give meaning and effect to all its language, if possible, and words are not to be rejected as superfluous when it is practicable to give to each a distinct and separate meaning (McKinney’s Cons Laws of NY, Book 1, Statutes, § 231). While the agency offered no proof to show that the parents are physically capable of discharging their parental responsibilities, neither did the respondents claim any physical infirmity. However, the respondents’ financial ability is zero; for it is undisputed that except for one brief period of a few weeks in 1975 when Mr. Santosky was employed as a laborer, he continues to be unemployed without income or any other financial resource. Moreover, until Mr. Santosky completes his vocational rehabilitation training at the oifice of Vocational Rehabilitation he is probably, given the present state of the economy and high rate of unemployment, for all practical purposes, unemployable. The Santoskys’ financial inability may not fairly be said to be the result of *741 their own transgressions (cf. Matter of Anthony "CC”, 48 AD2d 415, 418, supra).
The Santoskys do of course receive full public assistance, including food stamps and Medicare. However, it would take a strained construction indeed of the phrase "financially able to do so” to include as a financial resource public assistance, which for the foreseeable future is the Santoskys only source of income. Their very eligibility for full public assistance presupposes that they are "financially unable”.
Consequently, the Santoskys’ failure to plan for the future of their children has to be excused, if not by their intellectual deficiency and emotional immaturity, then by their poverty. A welfare budget presumably provides for the respondent’s current minimal needs, but makes no allowance for financing plans for the future. The Social Services Department would fault these parents for their failure to plan for the children’s future, yet will not provide them with the financial resources to do so. Secure, "even presumptuous, in its assumption of its own rectitude in the handling of what is one of the insoluble problems in a particularly disturbed part of our society”, the agency has concluded that these parents are so hopelessly unfit as to be unworthy of the further expenditure of their limited resources (see Matter of Irene O., 38 NY2d 776, 778). "The destruction of the poor is their poverty”[1], but they should not suffer the permanent loss of their children because caught up in this "Catch 22” situation.
For failure of proof of an essential element (Family Ct Act, § 614, subd [d]) this petition charging the respondents with the permanent neglect of their children must be dismissed (Family Ct Act, § 632, subd [a]). The result is unfortunate for the children who deserve better and whose future is left uncertain. Since there is just no way that these parents can be charged with fault for having failed to plan for the future of their children while financially unable to do so, society’s only recourse is to redouble its efforts to raise these parents to an acceptable minimal level of competency as parents, so that their children may one day be returned to them. The case is but another sorry reminder of the intractability of the human condition expressed in Jesus’ aphorism: "For the poor always ye have with you.”[2]

. King James Version, Proverbs 10:15.

. King James Version, St. John 12:8.