*471 OPINION OF THE COURT
Alma M. Gomez, J.
This matter comes before the court upon two motions. In this Family Court Act article 10 proceeding, the Administration for Children’s Services (ACS) seeks to compel three mental health providers to testify, at the dispositional hearing where the respondent mother seeks the release of the children to her care and custody, regarding the mental health counseling of respondent mother Kimberly F. (Ms. F.) who is declining to waive the therapist/social worker-patient privilege. Two therapists and Ms. F, asserting the therapist-patient privilege, move to quash the subpoenas for their testimony and therapy notes under relevant federal and state statutes (motion No. 1). In the alternative, they argue that any records produced should be reviewed in camera for the court to determine their relevance. Brian C. (Mr. C.), Ms. F.’s former paramour, has also filed a motion to intervene in this action as Jonathan’s father (motion No. 2). In the alternative, he seeks DNA testing.
Specifically, the critical issue in motion No. 1 is whether the privilege accorded therapist-patient communications bars the disclosure of previous communications between Ms. F. and her therapists at a dispositional hearing under the state’s Mental Hygiene Law § 33.13 and the Federal Health Insurance Portability and Accountability Act of 1996 (HIPAA) (Pub L 104-191, 110 US Stat 1936 [relevant portions codified as amended in scattered sections of 42 USC]). The principal issue in motion No. 2 is whether a prior denial of paternity by Mr. C. and acceptance by the court precludes a subsequent motion to intervene in the article 10 disposition for Jonathan C. In the alternative, the court must decide whether a DNA test should be ordered.
Whether a subpoena should be enforced rests in the judicial discretion of the court. This court, having read and considered the motion papers of the parties, the arguments of counsel, and pursuant to the applicable case law and statutes, concludes that it will compel the testimony of the three mental health providers, but the court will not compel the disclosure of the records maintained by these providers to the extent that these records reflect actual discussions between the therapist and patient. Moreover, no therapeutic records or notes will be released as ACS is not asking for access to the therapy records, only that the therapists bring to court whatever documentation supports their testimony. Additionally, Mr. C.’s motion to *472 intervene is denied in part, and granted in part to the extent that DNA testing is ordered.
Background
This proceeding involves three children: Heaven S., who is nine years old, her sister Nadiya S. and their half brother Jonathan, ages 11 years old and 18 months old, respectively. On or about January 24, 2014, ACS filed an article 10 petition, under docket number NA-XXXXX-XX/XX, against Ms. F. and her then paramour, Mr. O., alleging Heaven and Nadiya were sexually abused by Mr. O. On that day, Heaven was remanded to the care and custody of the Commissioner of ACS and she remains in foster care. Nadiya was temporarily released to the care and custody of her non-respondent father who lives in Pennsylvania under a preexisting order of custody. Ms. F. was permitted only supervised contact with Heaven, and no contact with Nadiya.
On May 1, 2014, ACS filed an abuse petition against Ms. F., which alleged that Jonathan was derivatively abused as she had allowed sexual offenses to be committed against Jonathan’s siblings, Nadiya and Heaven, by Mr. O. The same petition alleged that Ms. F. had seen a video of Heaven, then seven years old, being vaginally raped by Mr. O., and subsequently informed Jacobi Hospital staff that she didn’t “know who to believe because it didn’t look like Heaven was being abused in the video, it looked like she was enjoying it.” The petition further alleged that Mr. O. sexually abused Nadiya and that Nadiya reported the abuse to Ms. F. who “did not believe [her].” At the time the petition was filed, Mr. C. claimed to be the legal father of Jonathan. His name is not listed as Jonathan’s father on one birth certificate in the court file. However, on a different birth certificate for Jonathan in the court file, which is attached as exhibit D to the affirmation of Brian C., Mr. C. is listed as the father. Jonathan was initially released to Mr. C.’s care under ACS supervision. However, in July 2014, Mr. C., after an incident with Ms. F, which resulted in him seeking an order of protection against her, provided the court with a DNA test, dated June 4, 2014, indicating that there was a 0% chance he was the biological father of Jonathan. Mr. C. also provided the court with a notarized affidavit stating that he wished to have Jonathan removed from his care. On July 28, 2014, Mr. C. stated under oath, and on the record, that he was revoking his acknowledgment of paternity (see July 28, 2014 tr at 7). On *473 that day, Jonathan, who was three months old, was remanded to the care and custody of the Commissioner of ACS. Jonathan remains in foster care.
At some point after that court date, Mr. C. and Ms. F. apparently reconciled. On October 23, 2014, Mr. C. and Ms. F. signed an acknowledgment of paternity for Jonathan, which was filed with the court on November 20, 2014. Subsequently, Mr. C. filed for custody (docket No. V-XXXXX-XX) of Jonathan on February 23, 2015. Almost three months later, on May 22, 2015, Mr. C. filed a petition for guardianship (docket No. G-XXXX-XX) in which he swore that the legal birth father of Jonathan had never been established. Mr. C., to date, has not filed a petition seeking to establish paternity.
On or about January 20, 2015, after a fact-finding hearing, the Honorable Erik S. Pitchal entered a finding of abuse against Ms. F. based on her having knowledge of the sexual abuse of her children, Heaven and Nadiya, and failing to take appropriate action to protect those children. In effect, the court found that Ms. F. failed to maintain a reasonable degree of interest, concern, or responsibility as to her daughters’ welfare. The finding of abuse against her was based on a “deep lack of empathy for her children and self-centered narcissism” and “her serious flaw in parenting judgment” (see petitioner’s 2 in evidence at disposition, finding of abuse, dated Jan. 20, 2014 at 7). A court-ordered mental health study (MHS) (petitioner’s 3 in evidence at disposition, MHS, dated Mar. X, XXXX at 11) discusses her “chronic [mental illness] characterized by period [s] of difficulty with emotion regulation, which seemed to negatively affect her overall daily functioning” and her “history of poor decision-making skills and judgment which negatively affected her parental functioning.” Based upon observation and Ms. F.’s history, the interviewer found Ms. F.’s “insight, judgement and impulse control. . . to be limited” (see MHS at 9). As part of her service plan, Ms. F. has participated in individual counseling, family therapy with Heaven, and parenting classes.
At this time, the permanency goal is return to parent. A contested dispositional hearing was commenced on June 10, 2015. On or about August 18, 2015, counsel for Ms. F. received judicial subpoenas compelling the testimony of treating therapists for Ms. F. and her children. The three therapists are Flora M., LCSW, of the Postgraduate Center for Mental Health; Lindsay D., LMHC, of Chances for Children; and Isabel J., LCSW, of Astor Services for Children & Families. Ms. D. offers *474 dyadic therapy to Ms. F. and Jonathan, and Ms. J. is Heaven’s therapist. On August 31, 2015, Ms. F.’s attorney filed a motion to quash each subpoena. Counsel argued that HIPAA and state law prevent disclosure of any treatment information or testimony. ACS filed opposition papers, stating that objections to specific questions may be made during the mental health providers’ testimony, but the testimony itself is not prohibited under the law.
On August 24, 2015, Mr. C. filed a motion seeking to intervene. He claimed that he is Jonathan’s biological and legal father. ACS and the Attorney for the Child filed opposition papers. Notably, Ms. F. has not taken a position and has remained mute.
Discussion
A. Witness Subpoenas
ACS seeks to call the three therapists working with Ms. F. in order to elicit testimony regarding the level of insight Ms. F. has demonstrated in regards to the finding of abuse made against her. As argued by ACS, the specific issue in this case is Ms. F.’s flawed judgment and parenting capabilities.
In this case, the motion to quash highlights the tension between the court’s need for relevant evidence of Ms. F.’s mental health, specifically her level of insight since the entry of the abuse finding, to determine the best interests of the children, and the need to preserve confidentiality for effective mental health treatment. Counsel for Ms. F. maintains that the court should quash ACS’ subpoenas as it has failed to establish the materiality of the testimony, or how such testimony is relevant to the placement of her children. Additionally, counsel maintains that the probative value of the testimony is outweighed by the prejudice to Ms. F., and therefore the subpoenas should be quashed in the interests of justice. In the alternative, counsel asks that the information disclosed should be limited to overall diagnosis, treatment plan and attendance record, and any produced records should be reviewed in camera for relevancy.
1. The Therapist-Patient Privilege
The therapist-patient privilege is a recent development in the law, but it has been statutorily recognized in New York. The privilege has been defended on the basis of constitutional privacy interests and its advancement of the therapist-patient relationship (see e.g. Lora v Board of Educ. of City of N.Y., 74 *475 FRD 565, 569-576 [ED NY 1977]; Developments in the Law-Privileged Communications, 98 Harv L Rev 1450, 1542-1551 [May 1985]). “Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank disclosure of facts, emotions, memories, and fears” (Jaffee v Redmond, 518 US 1, 10 [1996] [the Court added that “the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment”]). Accordingly, by preventing a psychiatrist, social worker or psychologist from making public any information which would result in humiliation, embarrassment or disgrace to the client, the therapist-patient privilege is designed to promote effective treatment and to insulate the client’s private thoughts from public disclosure.
New York courts have applied a rigorous standard that allows the therapist-patient privilege to be pierced only where the party seeking disclosure demonstrates that information gleaned from evaluations and other sources is inadequate. In Perry v Fiumano (61 AD2d 512 [4th Dept 1978]), the parties’ separation agreement called for the father to be the primary custodian of the child. Subsequently, the child’s mother petitioned for primary custody. On her motion for a psychiatric examination of the father, the court ordered an examination of the mother, father, and the child. Later on in the proceeding, the mother sought records of the father’s prior counseling. Applying a “balancing of interests” test, the Court held that “where it is demonstrated that invasion of protected communications between a party and a physician, psychologist or social worker is necessary and material to a determination of custody the rule of privilege protecting such communications must yield” to the court’s duty to protect the welfare of the child (Perry v Fiumono, 61 AD2d at 519). Nonetheless, the Court emphasized that in light of possible “chilling effects” therapist-patient privilege should not “cavalierly be ignored or lightly cast aside” (id.). Instead, “[t]here first must be a showing beyond ‘mere conclusory statements’ that resolution of the custody issue requires revelation of the protected material” (id.).
2. HIPAA
Generally, a patient’s health and mental health information and records are confidential (see HIPAA; CPLR 4504, 4507; Mental Hygiene Law §§ 33.13, 33.16; 45 CFR parts 160, 164, subparts A, E). Pursuant to 45 CFR 160.103 “[h]ealth provid *476 ers must protect a person’s individually identifiable health information against deliberate or inadvertent misuse or disclosure” (Matter of Kayla S. [Eddie S.], 46 Misc 3d 747, 749 [Fam Ct, Bronx County 2014]). HIPAA, as well, provides that even an individual patient has no right to his therapist’s psychotherapy notes: “[A]n individual has a right of access to inspect and obtain a copy of protected health information about the individual in a designated record set . . . except for: (i) Psychotherapy notes” (45 CFR 164.524 [a] [1]). The Federal Department of Health and Human Services has specifically justified the additional protection afforded to psychotherapy notes as follows:
“[T]he rationale for providing special protection for psychotherapy notes is not only that they contain particularly sensitive information, but also that they are the personal notes of the therapist, intended to help him or her recall the therapy discussion and are of little or no use to others not involved in the therapy. Information in these notes is not intended to communicate to, or even be seen by, persons other than the therapist” (see 65 Fed Reg 82462-01, 82623 [Dec. 28, 2000]).
However, HIPAA is not intended to allow litigants to circumvent their obligation in civil discovery to disclose relevant, discoverable information. In fact, HIPAA expressly provides for when HIPAA-protected health care information may be disclosed during litigation. To begin, a health care provider may disclose records protected by HIPAA if the subject of those records authorizes their release (see 45 CFR 164.502 [a] [1] [iv]).
Additionally, HIPAA permits disclosures in a judicial proceeding when ordered by a court or administrative tribunal (see 45 CFR 164.512 [e] [1] [i]).
“A covered entity may disclose protected health information in the course of any judicial or administrative proceeding: (i) In response to an order of a court or administrative tribunal, provided that the covered entity discloses only the protected health information expressly authorized by such order; or (ii) In response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if: (A) The covered entity receives satisfactory assurance, as described in paragraph (e)(l)(iii) of this section, *477 from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or (B) The covered entity receives satisfactory assurance, as described in paragraph (e)(l)(iv) of this section, from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(l)(v) of this section” (45 CFR 164.512 [e] [1]).
Furthermore, that a therapist may withhold psychotherapy notes from an individual patient does not mean the therapist cannot be required by court processes, let alone court order, to produce psychotherapy notes.
“[I]t does not follow from the fact that a patient is not allowed to inspect her own notes under section 164.524 (a) (1) (i) that a court order plus a patient authorization are insufficient to permit the production of notes in a court proceeding . . . [T]here is no indication that the intent of the HIPAA regulations were to shield psychotherapy notes entirely from discovery in a judicial proceeding” (Kalinoski v Evans, 377 F Supp 2d 136, 138 n 3 [D DC 2005]; see also Townsend v Shook, 2007 WL 1612657, 2007 US Dist LEXIS 39814 [WD NC, May 31, 2007, No. 5:06cv70] [citing Kalinoski, where plaintiff claimed emotional distress and provided waiver of psychotherapist-patient privilege, and psychotherapist’s notes are essential to both plaintiff’s and defendant’s trial preparation, licensed marriage and family therapist was ordered to appear for deposition with notes, subject to protective order]).
Based on the plain language of HIPAA, it is clear to the court that HIPAA prohibits Ms. F.’s therapists’ testimony and the disclosure of her therapeutic records without her consent or an appropriate court order.
3. New York Mental Hygiene Law § 33.13 and Family Court Act Statutes
Mental Hygiene Law § 33.13 (c) states that information about mental health patients and clinical records and information tending to identify patients are not public records, and that such information and records may only be released under *478 certain limited exceptions. Under Mental Hygiene Law § 33.13 (f), “[a]ny disclosure [of mental health information] shall be limited to that information necessary in light of the reason for disclosure. Information so disclosed shall be kept confidential by the party receiving such information and the limitations on disclosure in this section shall apply to such party.”
Family Court Act § 1038 (a) authorizes broad disclosure of privileged and confidential records and documents in an article 10 child abuse and neglect proceeding (see also Family Ct Act § 1046 [making such records admissible at trial]). The purpose of this broad provision is
“to ensure that the Family Court in a child abuse and neglect proceeding has a comprehensive and complete record to guard against erroneous findings and to fulfill the purpose and mandate of the court to . . . protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being” (Matter of Kayla S. [Eddie S.], 46 Misc 3d 747, 750 [Fam Ct, Bronx County 2014] [internal quotation marks omitted]; see also Matter of Tricia K., 160 Misc 2d 935, 936 [Fam Ct, Kings County 1994]).
Given the plain meaning of the language of these two statutes, it is clear that the New York State Legislature intended to create a statutory exception to the therapist-patient privilege that otherwise could be asserted to bar testimony regarding mental health treatment or the use of therapeutic records in an article 10 proceeding.
In order for protected clinical records to be released without the consent of the patient under New York law, a court must find that the interests of justice significantly outweigh the need for confidentiality (see Mental Hygiene Law § 33.13 [c] [1], [7]). In order to meet this burden, ACS is required to articulate a link between the information sought and the issues to be determined (see People ex rel. Hickox v Hickox, 64 AD2d 412, 415 [1st Dept 1978]). Further, a party’s mental health records are subject to discovery where that party has placed her mental health at issue (see Matter of Frierson v Goldston, 9 AD3d 612, 614 [3d Dept 2004]).
4. Application
Ms. F.’s attorney insists that disclosure of confidential information provided during a therapeutic session will greatly impact the therapeutic process between Ms. F. and her *479 therapists. Additionally, she argues that given ACS’ failure to meet the standard for disclosure required by federal and state law, and the danger of breaching the confidentiality of Ms. F.’s treatment, the court should deny ACS’ request in its entirety. However, Ms. F.’s attorney has provided letters from Ms. F.’s therapists and service providers regarding her engagement in services to support her application for extended contact with her children.
ACS contends that this information is material and relevant as Ms. F.’s mental health, judgment, insight into her actions prior to the filing of the petition, and parenting capabilities are threshold issues in the dispositional hearing.
Here, the court must determine whether Ms. F.’s communication with three therapists are material and necessary to the determination of the children’s best interests such that the therapist-patient privilege should be suspended or exercised (see Liberatore v Liberatore, 37 Misc 3d 1034 [Sup Ct, Monroe County 2012]). “That determination must be based solely upon the best interests of the child [ren] ... in accordance with the standard expected of a wise, affectionate and careful parent” (Perry v Fiumano, 61 AD2d at 517). In article 10 proceedings, both the interests of justice and the protection of children outweigh the need for confidentiality (see Family Ct Act § 1046 [a] [vii]; Matter of Michelle HH., 18 AD3d 1075, 1077-1078 [3d Dept 2005]; Matter of Rockland County Dept. of Social Servs. v Brian McM., 193 AD2d 121, 124 [2d Dept 1993]).
The court agrees with ACS that the mental health information at issue is relevant and material (see Matter of Clear, 58 Misc 2d 699 [Fam Ct, NY County 1969]). Evidence that might prevent a detrimental placement is clearly relevant. In this case, ACS has a compelling interest in avoiding the placement of children with a parent who is psychologically unfit to provide adequate care or nurturance to a child, or who because of a psychiatric disorder would present a risk of harm to a child. That determination is of far greater importance than any injury to the relationship between the therapist and Ms. F. (Id.) Moreover, Ms. F. has placed her emotional and mental condition in controversy in this article 10 proceeding. These three therapists have conducted numerous treatment sessions with Ms. F. over a period of time, and are well positioned to provide the court as factfinder with vital information to help determine the best interests of the children. Lastly, the New York Legislature has balanced the competing interests *480 in favor of access to this testimony in child abuse proceedings. It is not this court’s role to second-guess the policy choices of the state legislature. Therefore, the motion to exclude the testimony of the three therapists must be denied, because to grant it would require the suppression of evidence material to a judicial determination, and the basic question of what is in the children’s best interests might not be properly answered.
As to the motion to quash the production of therapeutic records, it has not been demonstrated here that any records are being sought from any of the mental health providers or entity mentioned in the witness subpoenas. Thus, while these records appear to be confidential under Mental Hygiene Law § 33.13, the attorney for Ms. F. has failed to adequately demonstrate how the therapist-patient privilege is directly implicated. For this reason, the court finds that the motion to quash mental health records has no merit. If, however, ACS requests access to these records at the dispositional hearing, the court will review those records in camera, and they may be subject to a protective order.
B. Intervenor’s Motion
Family Court Act § 1035 (d) grants a non-respondent parent in a child protective proceeding “the right to appear and participate in the proceeding as an interested party intervenor for the purpose of seeking temporary and permanent custody of the child.” Counsel for Jonathan and ACS invoke the doctrine of equitable estoppel to preclude Mr. C.’s motion to intervene.
In general, the doctrine of equitable estoppel
“ ‘is imposed by law in the interest of fairness to prevent the enforcement of rights which would work [a] fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party’s words or conduct, has been misled into acting upon the belief that such enforcement would not be sought’ ” (Jean Maby H. v Joseph H., 246 AD2d 282, 285 [2d Dept 1998], quoting Nassau Trust Co. v Montrose Concrete Prods. Corp., 56 NY2d 175, 184 [1982]; see also Matter of Shondel J. v Mark D., 7 NY3d 320, 326 [2006]).
An estoppel defense may also be invoked where the failure to promptly assert a right has given rise to circumstances rendering it inequitable to permit the exercise of that right (Matter of John Robert P. v Vito C., 23 AD3d 659, 661 [2d Dept 2005], citing Matter of Ettore I. v Angela D., 127 AD2d 6, 12 [2d Dept *481 1987]). In the context of paternity and custody cases, the paramount concern in applying equitable estoppel is the best interests of the child (see Matter of Ruby M.M. v Moses K., 18 AD3d 471, 472 [2d Dept 2005]; Matter of Louise P. v Thomas R., 223 AD2d 592, 593 [2d Dept 1996]). Thus, the court must make a determination whether the doctrine of equitable estoppel should be applied in the best interests of the child (see Matter of Sharon GG. v Duane HH., 95 AD2d 466, 469 [3d Dept 1983], affd 63 NY2d 859 [1984]).
Jonathan is now 18 months old. Ms. F. and Mr. C. have been in a troubled intimate relationship. Mr. C. has not been consistent in his attempts to develop a parental relationship with Jonathan. Nor has he consistently held himself out as Jonathan’s father. Initially, Mr. C. held himself out as Jonathan’s father but then indicated that he was not Jonathan’s father. He is listed as Jonathan’s father on his birth certificate. Then, after falling out with Ms. F., he contradicted his earlier statement; disclaimed his paternity; submitted the results of a DNA test, which concluded that he was not the biological father; and permitted Jonathan to be placed into foster care. In doing so, the court in this proceeding accepted his disavowal of paternity, and warned him that due to his disclaimer of paternity, he would be precluded, in any future action, to rebut his stance. Now, he seeks to establish a different set of facts, and intervene in this case as Jonathan’s father.
However, ACS and the Attorney for the Child have failed to allege sufficient facts to establish equitable estoppel. “The essence of estoppel is to bar a party from asserting a position inconsistent with prior statements or acts that were relied upon by another which results in either gain by the party against whom estoppel is asserted or detriment by the party seeking to invoke estoppel” (Phillip E.K. v Sky M.L., 34 Misc 3d 559, 561 [Fam Ct, Genesee County 2011]). In this case, the court questions whether the principle of equitable estoppel is applicable. Instead, the court finds that the question in this case is whether by Mr. C.’s previous denial of paternity, he has forfeited his right to establish paternity.
The court’s decision is based upon a doctrine not espoused by the parties, the doctrine of judicial estoppel. The doctrine “prohibits a party from taking inconsistent positions, where he obtained a favorable judgment and subsequently takes an inconsistent position simply because his interests have changed” (Matter of S.L.K. v P.J.B., 14 Misc 3d 1208[A], 2006 NY Slip Op 52449 [U], *4 [Fam Ct, Nassau County 2006] [cita *482 tions omitted]). Equitable estoppel emphasizes the relationship between the parties, and it is designed to protect a litigant from injury from an unscrupulous opponent. In contrast, judicial estoppel focuses on the relationship between a litigant and the judicial system such that our court system will not permit a litigant to take one position in court, and then take a factually inconsistent position in the same action or another proceeding. To this court, it appears that the parties have confused the doctrine of equitable estoppel and judicial estoppel.
Applying these principles to the facts of this case, the court finds that Mr. C. sought to prevail on the issue of Jonathan’s paternity, two previous times, on opposite theories. He now seeks to override the “bargain” he made with Judge Pitchal. Almost 18 months later, in the same forum, he claims that he is the legal father of Jonathan and files a motion to intervene. He also has a petition for guardianship and a petition for custody pending. The court finds that “I am the father,” “I am not the father,” and “I am the father” are three conflicting statements. Mr. C. has failed to proffer a sufficient explanation for his contradictory statements.
Additionally, he has not made any showing that fraud, duress or lack of knowledge forced him to accept the court’s finding that he was not Jonathan’s father. In fact, he unequivocally asserted that position, which is inconsistent with his current position. When he denied paternity, Jonathan was approximately three months old. Jonathan has spent more than a year in foster care. Mr. C.’s denial of paternity has conferred significant economic advantage to him as he has not been required to provide support for Jonathan. Moreover, Mr. C. has abused the judicial process. At this time, given the doctrine of judicial estoppel, Mr. C. and the court are bound by the previous court ruling regarding his paternity. Consequently, the court finds that Mr. C. does not have the required standing to intervene in this action.
Arguably, the imposition of judicial estoppel may be inequitable from Jonathan’s perspective. The court must primarily consider the best interests of the child (see Matter of Bachman v Mejias, 1 NY2d 575, 581 [1956]). While a hearing is often necessary to consider a child’s best interests, the court concludes that under the circumstances, dismissal of Mr. C.’s motion would leave the issue of Jonathan’s true paternity legally unresolved.
*483 In this court’s opinion, courts should, as a general principle, be required to make accurate determinations of paternity, even if it is at the expense of a prior ruling. While the court recognizes that in some cases the best interests of the child might be served by preserving the status quo, the interests of the public are distinguishable from those of the child and are much broader in scope. New York’s general interest in the welfare of its children and its specific interest in the accurate determinations of paternity are, and always have been, compelling. Consequently, the court is unable to accept that public policy requires preservation of the status quo when determinations of paternity are at issue.
Family Court Act § 418 (a) provides that a court may order DNA testing “on its own motion or motion of any party, when paternity is contested.” CPLR 3121 (a) confers standing to seek a DNA test on a party to an abuse proceeding in which “the blood relationship of a party . . . is in controversy.” Mr. C. will not be permitted to intervene in this case unless he can demonstrate that he is Jonathan’s biological father. Therefore, his legal status must be ascertained before the court can permit him to intervene in this matter as a necessary party. The issue is open to resolution through a court-ordered DNA test. Accordingly, DNA testing is ordered.
Conclusion
The motion to quash the witness subpoenas is denied. However important a right of confidentiality may be with respect to this testimony, it must yield to the greater right of a child to be free from parental neglect or abuse. Based on the compelling public interest at stake in a child abuse proceeding, based on the fact that otherwise confidential communications are expressly admissible in such cases, and based on the relevant case law and statutes, this court finds that good cause does exist for the three therapists to appear as witnesses at the dispositional hearing.
The court further concludes that ACS’ application to dismiss the custody and guardianship petitions on the basis of equitable estoppel must be denied. The facts of this case are quite different from those where equitable estoppel has been accepted by New York courts. The court concludes, however, that Mr. C.’s motion to intervene in this proceeding is denied. The court’s review of the law leads it to conclude that DNA testing must be ordered. Both ACS and the court have the important duty of protecting children in need of care. Similarly, it is this *484 court’s duty to ensure that a child does not needlessly become a ward of the state as that is contrary to public policy and not in the child’s best interests.
Accordingly, it is therefore ordered that respondent mother Kimberly F.’s motion to quash the judicial subpoenas for the testimony of Flora M., LCSW, Isabel J., LCSW, and Lindsay D., LMHC, is denied; and it is further ordered that Brian C.’s motion to intervene in this proceeding is denied; and it is further ordered that Brian C. is to submit to genetic marker (DNA) testing within 14 days of entry of this order; and it is further ordered that ACS and/or its contract agency are to ensure that Jonathan C. is produced for genetic testing.