# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00596-COA

**LAUREN ASHLEY HARRIS**                                      **APPELLANT**

**v.**

**DEBORAH RATCLIFF AND ARBOR**                               **APPELLEES**
**PHARMACEUTICALS, INC.**

DATE OF JUDGMENT:                03/24/2022
TRIAL JUDGE:                     HON. CLAIBORNE McDONALD
COURT FROM WHICH APPEALED:       LAMAR COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          DANIEL MYERS WAIDE
ATTORNEYS FOR APPELLEES:         DONNA MARIE MEEHAN
                                 MICHAEL D. SIMMONS

NATURE OF THE CASE:              CIVIL - PERSONAL INJURY
DISPOSITION:                     AFFIRMED - 01/23/2024
MOTION FOR REHEARING FILED:

### BEFORE CARLTON, P.J., GREENLEE AND EMFINGER, JJ.

### GREENLEE, J., FOR THE COURT:

¶1.     Ashley Harris was injured in a car accident and sued defendants Deborah Ratcliff and her employer Arbor Pharmaceuticals, Inc. for negligence. At trial, the jury awarded Harris damages that were less than the damages she claimed. After the court denied her motion for a new trial or additur, Harris appealed, claiming the court erred by (1) allowing Arbor to designate expert witnesses past the discovery deadline; (2) striking Harris' expert witness due to a discovery violation; (3) denying Harris leave to substitute a witness who had fallen into a coma; and (4) excluding a brain scan from evidence after Harris agreed not to introduce it. Finding no abuse of discretion, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.     On July 30, 2015, Deborah Ratcliff drove her vehicle into the back of Ashley Harris'

vehicle in Lamar County. Ratcliff, an employee of Arbor Pharmaceuticals (Arbor), was

acting within the course and scope of her employment at the time of the collision.[1] Harris

declined medical attention at the scene but began suffering from head and neck pain the next

day. Harris went to the hospital in Hattiesburg where doctors examined her neck and head.

The hospital diagnosed Harris with a concussion but found that there was no sign of major

injury. Harris later claimed that her pain became worse and she began experiencing changes

in her mood and trouble with memory. Harris eventually lost her job, which was attributed

to the complications of her injury.

¶3.     Harris retained counsel in May 2016 who then contracted the medicals for Harris' case

with HMR Funding, LLC (HMR), a Virginia company. HMR began setting appointments

for Harris at various medical facilities. HMR negotiated the price for Harris' treatment and

paid for it, essentially assuming Harris' medical debt. Over the next several years, Harris

was seen by several doctors from Louisiana, Texas, and Florida. Harris received treatment

for a brain injury and also a neck injury. She also spent several months commuting to North

Texas Rehab, in Texas. There Harris participated in a "brain therapy" program that included

several different forms of therapy. According to Harris, the therapy helped her symptoms.

¶4.     Harris originally filed the lawsuit beginning the action in Forrest County Circuit Court

against Arbor and Ratcliff on October 16, 2016. The case was transferred to Lamar County

after Arbor's objection to venue. Because of the many medical providers, the litigation

---

[1] Ratcliff and Arbor are represented by the same counsel. Unless it is necessary to
distinguish between the two, we will refer to both defendants as "Arbor."

required substantial discovery, necessitating that Arbor's counsel open a separate action in Virginia to be able to subpoena documents from HMR. The Lamar County Circuit Court entered a scheduling order on June 29, 2018, setting the trial date as June 3, 2019; the discovery deadline as March 10, 2019; and Arbor's expert designation deadline as December 1, 2018. Harris filed an unopposed motion to extend the expert disclosure deadline, also requesting that Arbor's new deadline be set as January 1, 2019. The court ratified the deadlines in a subsequent scheduling order. Another agreed-upon order amending the scheduling deadlines changed Arbor's expert designation deadline to January 31, 2019.

¶5. Arbor did not formally designate its experts by the January 31 deadline. Arbor had informally provided Harris with the names of its two experts and a general description of their testimonies. In April 2019, both parties requested leave from the court to engage in out-of-time discovery proceedings. Harris requested permission on April 23, 2019, to conduct an out-of-time trial deposition of their witness Dr. Kerri Tom. Harris had discovered that Dr. Tom would not be able to attend the trial due to her twentieth wedding anniversary. On April 26, 2019, Arbor requested leave of court to formally designate their expert witnesses past the deadlines stating that a new attorney had taken over the case and her paralegal had failed to mark the expert designation deadline on the calendar.[2] The court granted both Harris' and Arbor's motions, setting the new trial date for October 14, 2019. The trial was later continued to June 21, 2021.[3]

---

[2] Arbor's motion also requested a continuance of the trial until October 2019.

[3] The parties spent a substantial amount of time dealing with HMR. Arbor filed a motion in limine to clarify Mississippi's collateral source rule. After several hearings and

¶6.     Prior to trial, Arbor objected to Harris' proposed exhibit P-3 which consisted of a Diffusion Tensor Imaging (DTI) brain scan of Harris' brain. This DTI scan was also included in Harris' proposed exhibit P-2 along with a variety of Harris' other medical tests. After several minutes of argument, Harris' counsel represented to Arbor and the court that Harris would not be introducing the DTI scan into their case-in-chief. The court did not rule on the objection, instead finding it moot because "[Harris] stated at the hearing that she does not intend to introduce medical records from Dr. David Patterson in case-in-chief." When trial commenced on June 21, 2021, during opening statements, Harris' counsel showed the jury Harris' DTI brain scan on a monitor. Upon objection, the court granted a mistrial, setting the new trial date for June 15, 2022.

¶7.     Between the first trial and second trial, Harris learned that Dr. Lucy Sapp, one of Harris' expert witnesses, had suffered a medical emergency and was in a coma. Harris had previously conducted a recorded deposition of Dr. Sapp which Harris had intended to use at trial in lieu of live in-person testimony. Harris had intended to supplement Dr. Sapp's testimony when she learned of Dr. Sapp's condition. Harris sought leave to substitute another expert for Dr. Sapp which Arbor opposed. The court ruled that at this late date, Harris would not be allowed to substitute the witness because she already had the video recording of Dr. Sapp's intended trial testimony.

¶8.     Harris called several witnesses to testify, including Dr. Kerri Tom. Dr. Tom was a contract psychologist at North Texas Rehab and testified that she supervised all of Harris'

_____

motions, Arbor filed a petition of interlocutory appeal which the Mississippi Supreme Court ultimately denied.

4

treatment there. During her testimony, Dr. Tom discussed some aspects of Harris' condition unfamiliar to Arbor's counsel. On cross-examination, Arbor's counsel asked Dr. Tom if she had been reading off of any notes during her testimony. Dr. Tom responded that she was testifying from private notes that she kept locked in her safe at work. These notes had not been turned over during discovery and Arbor immediately objected to Dr. Tom's testimony. After hearing arguments, the court found that the failure to disclose Dr. Tom's notes was a discovery violation. The court then struck all of Dr. Tom's testimony as a sanction.

¶9. At the conclusion of trial, the jury awarded Harris $400,000 in damages. Harris, who had claimed medical damages over $700,000, filed a motion for a new trial or for additur which was denied. She now appeals.

## STANDARD OF REVIEW

¶10. "In reviewing rulings of a trial court regarding matters of evidence, relevancy and discovery violations, the standard of review is abuse of discretion." *Smith v. State*, 297 So. 3d 1139, 1141 (¶12) (Miss. Ct. App. 2020) (quoting *Montgomery v. State*, 891 So. 2d 179, 182 (¶6) (Miss. 2004)). "If the trial court applies the correct legal standard, we must affirm the decision, regardless of what any one of us individually might have ruled had we been the judge, unless there is a definite and firm conviction that the court below committed clear error." *Kinzie v. Belk Dept. Stores L.P.*, 164 So. 3d 974, 977 (¶4) (Miss. 2015) (quoting *Ashmore v. Miss. Auth. on Educ. Television*, 148 So. 3d 977, 981 (¶11) (Miss. 2014)).

## DISCUSSION

¶11. Harris claims the court erred by: (1) allowing Arbor an additional extension of the

expert disclosure deadline; (2) striking Dr. Kerri Tom's testimony; (3) denying Harris leave to substitute Dr. Lacy Sapp; and (4) excluding Harris' DTI brain scan from evidence at trial.

**(1)    Granting Leave for Expert Disclosures**

¶12.    Harris claims the court abused its discretion by granting leave for Arbor to formally designate its expert witnesses over eighty-four days past the expert designation deadline. Harris claims that the court erred by not following precedent. In *Bowie v. Montfort Jones Memorial Hosp.*, 861 So. 2d 1037 (Miss. 2003), the plaintiffs filed a motion for an extension of time to designate their expert witness after sixty-four days past the expert designation deadline, which the trial judge denied. *Id.* at 1040 (¶5). The Mississippi Supreme Court affirmed the trial judge's ruling, finding that it was not an abuse of discretion. *Id.* at 1043 (¶¶15-16). The supreme court noted that neither the identity nor the affidavit of the plaintiffs' expert witness had been made available until after the defendants filed a motion for summary judgment. *Id.* at 1042 (¶13). The supreme court also noted that the trial judge made a specific finding that the plaintiffs had "failed to show *any* excusable neglect as to why the designation of the expert was not timely filed." *Id.*

¶13.    The facts in this case differ from those in *Bowie*. The court here allowed an out-of-time expert designation for Arbor's two expert witnesses, and found that Arbor showed good cause. Unlike in *Bowie*, Arbor made the motion of its own volition, after having discussed the situation with Harris. At the same time, Harris was also seeking to take an out-of-time deposition after the deadline. The court herein granted both Harris' and Arbor's motions in the same order. Unlike *Bowie*, Harris had been made aware via email of both the identity of

6

the witnesses and the substance of the testimony. Ultimately, the court found good cause to allow Arbor's out-of-time expert designation.

¶14.    Harris argues that *Bowie* created a bright-line rule regarding out-of-time designations of experts. *Bowie* did not create a bright-line rule but noted that substantial discretion was allowed to judges on discovery issues. *Id.* at 1043 (¶14). Harris failed to cite authority where a trial court's decision was reversed after allowing an out-of-time expert designation. Under the circumstances in this case, we find that the court did not abuse its discretion by granting Arbor an extension to designate expert witnesses.

### (2)    Striking Dr. Tom's Testimony

¶15.    Harris claims the court abused its discretion by striking Dr. Tom's testimony as a sanction for a discovery violation. Mississippi Rule of Civil Procedure 37 provides courts with several remedies for discovery violations ranging from an order to designate facts taken as established to outright dismissal of a case. M.R.C.P. 37. The dismissal of a case is usually reserved for cases where a party knowingly gives false testimony under oath or conceals significant facts from the court. *Pierce v. Heritage Props. Inc.*, 688 So. 2d 1385, 1391-92 (Miss. 1997). The Mississippi Supreme Court has also stated "that the lower court should be cautious in refusing to permit testimony." *Ladner v. Ladner*, 436 So. 2d 1366, 1371 (Miss. 1983). "In other words, penal sanctions are not to be imposed per se for every discovery violation, and a determination of whether to impose such a sanction is ordinarily vested in the sound discretion of the trial judge." *Id.* "The Court has long held that our trial courts have the discretion to impose sanctions for discovery violations which result from

7

willful neglect, willful disobedience or cause undue advantage and surprise." *Fresenius Med. Care Holdings Inc. v. Hood*, 269 So. 3d 36, 60 (¶85) (Miss. 2018).

¶16.   In this case, the judge found that Harris committed a discovery violation by failing to disclose Dr. Tom's psychotherapy notes. The judge's reasoning was based on the totality of the circumstances. The case had been going on for over seven years, with the first trial resulting in a mistrial. Harris' counsel stated that he did not request the notes from Dr. Tom because he did not know the notes existed, and he relied on what documents were provided from the hospital's medical records. Yet Arbor's counsel was able to discover the existence of these notes on cross-examination by simply asking Dr. Tom which documents her testimony concerned. The judge found it was unsatisfactory that Harris' counsel relied on "summaries and reports" about Dr. Tom's testimony. Finally, the judge found that discovering and using the notes during the middle of trial was prejudicial to Arbor.[4]

¶17.   The record does not suggest that Harris intentionally kept Dr. Tom's notes from Arbor during discovery. At trial, Dr. Tom testified that the notes were not in Harris' medical file because "psychotherapy notes"[5] are specifically protected by HIPAA."[6] Federal HIPAA

---

[4] The judge also believed Dr. Tom's testimony was detrimental to Harris' case. He stated, "Sure, you [Arbor] can make your motion and sure ask me what you want me to do, but what I'm saying is after listening to all this, I think she's hurting him [Harris' counsel] worse than she's hurting y'all."

[5] The regulations define psychotherapy notes as "notes recorded (in any medium) by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the individual's medical record." 45 C.F.R. § 164.501.

[6] Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191,

8

regulations exempt "psychotherapy notes" from an individual's general right to access their own protected health information. 45 C.F.R. § 164.501. Under these federal regulations, "an individual patient has no right to his therapist's psychotherapy notes." *In re Jonathan C.*, 28 N.Y.S.3d 764, 770-71 (N.Y. Fam. Ct. 2015). Therefore, "a psychotherapist may withhold psychotherapy notes *from an individual patient*." *Tedford v. Coastal Behav. Health LLC*, No. KNLCV116008902S, 2014 WL 683866, at *2 (Conn. Super. Ct. Jan. 24, 2014) (emphasis added). However, while "a patient is not allowed to inspect her own [psychotherapy] notes," the federal regulations do not "shield psychotherapy notes entirely from discovery in a judicial proceeding." *Kalinoski v. Evans*, 377 F. Supp. 2d 136, 138 n.3 (D.D.C. 2005). An opposing party may obtain psychotherapy notes in discovery if the notes are otherwise discoverable and the patient executes an authorization for their release. *Id.*; *Evenson v. Hartford Life & Annuity Ins.*, 244 F.R.D. 666, 667-68 (M.D. Fla. 2007).

¶18.    Harris' counsel admitted that he did not ask Dr. Tom specifically for her notes. However, Harris' counsel should have been aware of these notes through prepping Dr. Tom as a witness but was caught off guard when Dr. Tom began to testify while using information contained in the psychotherapy notes. In essence, this lack of diligence led to Dr. Tom testifying from these notes during trial. Considering when discovered at trial, striking Dr. Tom's testimony was not an overly harsh remedy. Harris argues that this was error because the contents of the notes were not a surprise or prejudicial. The notes themselves were a surprise to both parties and the contents of the notes were not available when the judge made

110 Stat. 1936.

9

his ruling. Furthermore, it was not entirely clear which parts of Dr. Tom's testimony were related to admitted evidence and which came from the psychotherapy notes. It is true that "the exclusion of evidence is a last resort. Every reasonable alternative means of assuring the elimination of any prejudice to the moving party and a proper sanction against the offending party should be explored before ordering exclusion." *Smith ex rel. Smith v. Miss. Coast OB/GYN*, 325 So. 3d 723, 732 (¶33) (Miss. Ct. App. 2021) (citing *TXG Intrastate Pipeline Co. v. Grossnickle*, 716 So. 2d 991, 1013 (¶66) (Miss. 1997)). Yet Harris was not able to provide the judge with any other reasonable alternative to cure the prejudice at the time. Dr. Tom had already provided her initial testimony before the notes' existence was discovered. Given the circumstances, the court did not abuse its discretion by excluding Dr. Tom's testimony.

### (3) Denying the Witness Substitution

¶19. Harris claims that the court erred in denying her motion to substitute an expert for Dr. Lucy Sapp who was then in a coma. Harris failed to supplement Dr. Sapp's testimony from the end of 2018 until the beginning of the first trial in 2021. Harris had undergone surgery during that time but did not attempt to supplement Dr. Sapp's testimony until after the mistrial. Furthermore, Harris was prepared to use Dr. Sapp's video testimony rather than in-person testimony yet claims on appeal that she was denied the ability to call on a live witness during the trial. Harris argues that the two-year-old deposition failed to address her plans for additional surgery and several changes in employment. However, Harris could have testified to any changes in her circumstances that took place between the video deposition and second

10

trial. The court's decision to deny the witness substitution of a new witness in favor of Dr. Sapp's video testimony was well reasoned under the circumstances. The trial court did not abuse its discretion.

### (4)    Excluding the Brain Scan

¶20.    Harris claims excluding as evidence her DTI brain scan was error. Harris underwent the subject DTI scan in April 2017. Arbor objected to the DTI scan and the court questioned Harris' counsel about its admissibility. Harris' counsel admitted that he did not know who ordered the scan and that he had no medical expert to testify regarding the scan. The scan itself was identified as Plaintiff's Exhibit P-3. However, the scan was also included in Plaintiff's Exhibit P-2, which consisted of nearly one hundred pages of documents listed as Dr. Almubaslat's records that had not been objected to by Arbor. Dr. Almubaslat was Harris' treating physician for her neck injury and testified that he did not treat any of Harris' head complaints or head issues. Before the court was forced to rule, Harris' counsel stated that they were not going to introduce the DTI scan in their case in chief:

> THE COURT: No. I'm talking about she's the one that's going to testify as to the results of those imaging tests and what they mean, she's going to do that?
>
> MR. WAIDE: No, sir.
>
> THE COURT: You got anybody that's going to do that?
>
> MR. WAIDE: No, Your Honor. They are objecting to it. We've still got them in the record, but we're not going to put forth any doctor to testify about them. We still have them if something comes up, but we're not offering them in our case in chief.
>
> THE COURT: Hold on. You aren't going to introduce that stuff?
>
> MR. WAIDE: No, sir.
>
> THE COURT: Why are we talking about it?
>
> MS. MEEHAN: What stuff?

11

| MR. WAIDE: | Talking about the DTI. |
| MS. MEEHAN: | Wait. Did you just withdraw P3? |
| Mr. WAIDE: | No. We're not withdrawing it, but we don't plan to introduce it. |

The court did not rule on Arbor's objection because Harris agreed not to offer the DTI scans as evidence in their case. When Harris discussed the DTI scan in opening statements at the first trial after Arbor objected, the court declared a mistrial. The court also ruled that DTI scan would be excluded and that all references to the scan in the record be redacted.

¶21. Harris argues that the DTI scan was admitted through agreed-upon documents, such as P-2, in which the scan was contained. While Arbor did not object to exhibit P-2, Arbor did specifically object to the DTI scan's inclusion into evidence. However, Harris' statements about introducing into evidence the DTI scan were obvious to the court. Harris made clear she was not going to offer the DTI scan into evidence and Arbor and the court relied on that representation. Harris' argument lacks merit.[7]

¶22. Next, Harris argues the DTI scan was admissible on its own. But Harris did not have any witnesses who could testify about the DTI scan. Mississippi Rule of Evidence 901(a) states, "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." MRE 901(a). While Harris may have had witnesses who could

---

[7] Harris also claims that the court erred by declaring a mistrial in the first trial. As discussed, Arbor and the court relied on Harris' representation that she would not introduce the DTI scan into evidence. The judge polled the jury to determine if the members could disregard the scan; however, several jurors were members of the medical community and stated that they could not disregard what they had seen. The decision to declare a mistrial was not an abuse of discretion.

identify that the exhibit was a DTI scan, she had no witness who had ordered the scan, no witness who relied on the scan for any treatment, and no witness who could properly interpret the results of the scan.

¶23.   Harris' reliance on *Cassibry v. Schlautman*, 816 So. 2d 398 (Miss. Ct. App. 2001), is unsupported here.   This Court in *Cassibry* affirmed the trial court's ruling that medical documents were admissible when the patient was able to authenticate her own records.  *Id.* at 404 (¶22).   However, in *Cassibry* the patient was present at the time when her doctor made each record and was "clearly involved in the preparation of the documents."  *Id.* at (¶23). Furthermore, the patient was able to testify to the accuracy of the records during trial.  *Id.* Harris was not able to accurately testify about the DTI scan at trial and was not involved in the preparation of the documents in the record.

¶24.   Finally, Harris claims that Arbor opened the door allowing the introduction of the DTI scan through Arbor's opening statement and in Arbor's expert witness's testimony.  In its opening argument, Arbor stated that all the medical tests the Hattiesburg doctors performed showed that Harris' head and neck were normal.  The DTI scan was performed in Louisiana months after Harris' initial treatment in Hattiesburg.  At trial, Dr. Jim Irby, one of Arbor's expert witnesses, testified that "[a]ll the neuro imaging that she's ever had has been normal . . . ."  Harris objected and argued that she should be able to discuss the DTI scan to refute this testimony.  The court did allow Harris to cross-examine Dr. Irby with the DTI scan to attack his opinion.  Dr. Irby reviewed the scan and stated that his statement and opinion remained unchanged.  Harris has not shown an abuse of discretion by the trial court.

## CONCLUSION

¶25.   Finding no abuse of discretion, we affirm the trial court's final judgment and denial of Harris' motion for a new trial or additur.

¶26.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.  WESTBROOKS AND McDONALD, JJ., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., NOT PARTICIPATING.**